UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THOMAS F. SHUMAN,

                              Plaintiff,            04 Civ. 3263 (DAB) (DFE)

                vs.

TIEDEMANN INVESTMENT GROUP, et al.,

                              Defendants.

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
<u>PARTIAL SUMMARY JUDGMENT AND LEAVE TO AMEND THEIR ANSWER</u>**

**Table of Contents**

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 3

ARGUMENT ....................................................................................................... 7

I.  DEFENDANTS TIEDEMANN INVESTMENT GROUP (THE "UMBRELLA ENTITY"), TIEDEMANN INVESTMENT GROUP, INC. AND TIEDEMANN TRUST COMPANYSHOULD BE DISMISSED FROM THIS ACTION ............................................................................. 7

A.  Tiedemann Investment Group (the "Umbrella Entity") Is Not A Legal Entity Capable Of Being Sued ...................................................... 7

B.  Tiedemann Investment Group, Inc. Should Be Dismissed Because Plaintiff Cannot Demonstrate That Such An Entity Exists ........................... 8

C.  Tiedemann Trust Company Should Be Dismissed Because It Was Not Plaintiff's Employer ....................................................................... 8

II.  ANY CLAIM FOR DAMAGES ARISING FROM THE ALLEGED FAILURE TO PROMOTE PLAINTIFF IN 2000 SHOULD BE DISMISSED AS A MATTER OF LAW BECAUSE IT IS TIME BARRED ............................... 11

III.  PLAINTIFF'S CLAIMS FOR UNPAID COMMISSIONS AND RETALIATION  FAIL AS A MATTER OF LAW  ................................. 12

A.  Plaintiff's Claims For Unpaid Commissions Are Barred By the Statute of Frauds .......................................................................... 14

B.  As A Matter of Law The Alleged Failure To Pay Commissions Is Not Retaliation ................................................................................ 17

IV.  PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES SHOULD BE STRICKEN ................................................................................... 19

A.  Punitive Damages Are Unavailable Under the ADEA and the NYSHRL And Cannot Be Sought Under the NYCHRL In Age Discrimination Cases ................................................................... 20

B.  Even If Punitive Damages Were Available, Plaintiff Fails To Satisfy The Standard for Such An Award ..................................................... 21

V.  LEAVE TO AMEND DEFENDANTS' ANSWER TO INCLUDE THE STATUTE OF FRAUDS AS AN AFFIRMATIVE DEFENSE SHOULD BE GRANTED ..................................................................................... 24

CONCLUSION ................................................................................................... 25

## <u>Table of Authorities</u>

### FEDERAL CASES

*Bailey v. Synthes*, 295 F. Supp. 2d 344 (S.D.N.Y. 2003) ........................................................11, 12

*Balut v. Loral Elec. Sys.*, 988 F. Supp. 339 (S.D.N.Y. 1997)................................................ 8-9, 10

*Binder v. LILCO*, 933 F.2d 187 (2d Cir. 1991)...............................................................................7

*Bragg v. Emmis Broadcasting Corp.*,
      1998 U.S. Dist. LEXIS 16290, (S.D.N.Y. 1998).......................................................7, 9, 10

*Celotex Corp. v. Catrett*, 477 U.S. 317, 91 L. Ed. 2d 265 (1986) ...................................................7

*Chambers v. Capital Cities*, 851 F. Supp. 543 (S.D.N.Y. 1994)...........................................20, 21

*Chapkines v. New York University*,
      2004 U.S. Dist. LEXIS 2990 (S.D.N.Y. 2004)..................................................................21

*Comm'r v. Schleier*, 515 U.S. 323, 115 S. Ct. 2159, (1995).......................................................20

*Cook v. Arrowsmith*, 69 F.3d 1235 (2d Cir. 1995) ........................................................................9

*Costanzo v. The United States Postal Service*,
      2003 U.S. Dist. LEXIS 911 (S.D.N.Y. 2003)...................................................................11

*Curtis v. Citibank, N.A.*, 70 Fed. Appx. 20 (2d Cir. 2003) ...........................................................7

*Dewey v. PTT Telecom Netherlands, U.S., Inc.*,
      1995 U.S. Dist. LEXIS 10028 (S.D.N.Y. 1995)................................................................9

*Frishberg v. Esprit De Corp.*, 778 F. Supp. 793 (S.D.N.Y. 1991) .................................................8

*Garber v. New York City Police Department*,
      1998 U.S. App. LEXIS 20181 (2d Cir. 1998) ..................................................................18

*Gates v. BEA Associates, Inc.*,
      1990 U.S. Dist. LEXIS 15299 (S.D.N.Y. 1990)................................................................24

*Goldmark Assoc., Inc. v. Technical Erectors, Inc.*,
      1990 U.S. Dist. LEXIS 7323 (S.D.N.Y. 1990) .................................................................16

*Herman v. Blockbuster Entertainment Group*,
      1999 U.S. App. LEXIS 11976 (2d Cir. 1999) ..................................................................10

*Hollander v. American Cyanamid Co.*, 895 F.2d 80 (2d Cir. 1990)........................................17, 18

*Karlin v. Avis,* 457 F.2d 57 (2d Cir. 1972)  ...............................................................17

*Kellett v. Glaxo Enterprises, Inc.*,
    1994 U.S. Dist. LEXIS 17021 (S.D.N.Y. 1994).....................................................9

*Koch v. Multiplan, Inc.*, 2001 U.S. Dist. LEXIS 2142 (S.D.N.Y. 2001).......................................17

*Kolstad v. Ada,* 527 U.S. 526, 119 S. Ct. 2118 (1999) .................................................21

*Knutson v. Brounstein*, 2001 U.S. Dist. LEXIS 21573 (S.D.N.Y. 2001) ...............................21, 23

*Lee v. Overseas Shipholding Group, Inc.*,
    2001 U.S. Dist. LEXIS 10622 (S.D.N.Y. 2001).....................................................12

*Manning v. Utilities Mutual Insurance Co.*, 254 F.3d 387 (2d Cir. 2001) ...................................24

*McCullough v. Financial Info. Servs. Agency*,
    923 F. Supp. 54 (S.D.N.Y. 1996)......................................................................7

*Murphy v. General Electric Co.*, 245 F. Supp. 2d 459 (N.D.N.Y. 2003) .....................................11

*Naftchi v. New York University*, 14 F. Supp. 2d 473 (S.D.N.Y. 1998).........................................18

*Nat'l R.R. Passenger Corp. v Morgan*, 536 U.S. 101 (2002) .........................................11

*Quinn v. Green Tree Credit Corp.*, 159 F.3d 759 (2d Cir. 1998) .................................11

*Rose v. Green*, 1998 U.S. App. LEXIS 12941 (2d Cir. 1998).......................................18

*Royal Insurance Co. v. DHL Worldwide Express*,
    1999 U.S. Dist. LEXIS 10530 (S.D.N.Y. 1999)....................................................24

*Samuel v. Merrill Lynch Fenner & Smith*,
    771 F. Supp. 47 (S.D.N.Y. 1991).......................................................................12

*Thoreson v. Penthouse Int'l*, 80 N.Y.2d 490 (1992) .....................................................20

*Topo v. Dhir*, 2003 U.S. Dist. LEXIS 10530 (S.D.N.Y. 1999) .......................................24

*Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176 (2d Cir. 1992) .....................................20

*Vestrock Partners v. California Energy Company.*, 1993 U.S. Dist. LEXIS 11882
    (S.D.N.Y. 1993).........................................................................................25

*Walker v. Connetquot Central School District of Islip Central Offices*,
2000 U.S. App. LEXIS 14620 (2d Cir. 2000) ...................................................12

*Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224 (2d Cir. 2000)............................................23

*Woodell v. United Way of Dutchess County*,
357 F. Supp. 2d 761 (S.D.N.Y. 2005)..............................................................10

**STATE CASES**

*Agee v. Read Q Systems, Inc.*,
70 A.D.2d 805, 417 N.Y.S.2d 494 (1st Dep't 1979) .........................................16

*Apostolos v. R.D.T. Brokerage Corp.*, 559 N.Y.S.2d 295, (1st Dep't 1990)................................16

*Caruso v. Malang, Jr.*,
250 A.D.2d 800, 673 N.Y.S.2d 470 (2d Dep't 1998) .........................................16

*Hausen v. Academy Printing & Specialty Co., Inc.*,
34 A.D.2d 792, 311 N.Y.S. 2d 613 (2d Dep't 1970)..........................................16

*Kalfin v. United States Olympic Committee*,
209 A.D.2d 279, 618 N.Y.S.2d 724 (1st Dep't 1994) ........................................15

*Little Shoppe Around the Corner v. Carl*,
363 N.Y.S.2d 784 (Sup. Ct. Rockland County 1975)....................................7-8

*Marder v. Betty's Beauty Shoppe*, 239 N.Y.S.2d 923 (2d Dep't 1962)..........................................8

*Provosty v. Lydia E. Hall Hospital*, 457 N.Y.S.2d 106 (2d Dep't 1982) ........................................8

*Whitman Heffernan Rhein & Co, Inc. v. Griffin Co.*,
163 A.D.2d 86, 557 N.Y.S.2d 342 (1st Dep't 1990) ..........................................17

*Zupan v. Blumberg*, 2 N.Y.2d 547, 161 N.Y.S.2d 428 (N.Y. 1957)............................................15

**FEDERAL STATUTES**

AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 .............................................. *passim*

FED. R. CIV. P. 15 ...........................................................................................1, 24

FED. R. CIV. P. 17 ...............................................................................................7

FED. R. CIV. P. 56 ...................................................................................... *passim*

## NEW YORK STATE STATUTES

New York City Human Rights Law ................................................................................... *passim*

New York State Human Rights Law................................................................................ *passim*

N.Y. Gen. Oblig. Law 5-701 .......................................................................................15, 16

N.Y. Exec. Law § 297(9) ............................................................................................20, 21

N.Y. Labor Law §§ 190.............................................................................................13, 17

Defendants Tiedemann Investment Group (a general partnership) ("TIG"), Tiedemann Investment Group (referred to as an "umbrella organization"), Tiedemann Investment Group, Inc., Tiedemann & Co., Tiedemann Trust Company, Carl H. Tiedemann, Bruce T. Prolow, Michael Tiedemann, Barbara Warga Naratil, C. Hans Tiedemann, Drew Figdor, James C. Ayer, Dominic Moross, Steve Diamond and Gregory van Kipnis (collectively, the "Defendants") respectfully submit this memorandum of law in support of their motion (A) pursuant to Fed. R. Civ. P. Rule 56(b) granting them partial summary judgment dismissing from this action (1) defendants Tiedemann Investment Group (referred to as an "umbrella entity"), Tiedemann Investment Group, Inc. and Tiedemann Trust Company; (2) any claim for damages arising out of the alleged failure to promote Plaintiff in 2000; (3) the claims for unpaid commissions and retaliation in the Second, Fourth, Sixth, Ninth, Tenth, Eleventh and Twelfth causes of action; and (4) the claim for punitive damages and (B) pursuant to Fed. R. Civ. P. 15 for leave to amend Defendants' Answer to the Second Amended Complaint to assert the affirmative defense of the Statute of Frauds to the Ninth, Tenth, Eleventh and Twelfth causes of action.

## **Preliminary Statement**

This is an age discrimination action originally commenced in April 2004 by Plaintiff Thomas F. Shuman ("Shuman" or the "Plaintiff"), a former employee who was responsible for marketing TIG's investment funds, against TIG and its partners alleging claims for age discrimination and aiding and abetting thereof.  Defendants contend that Plaintiff was a persistent underperformer who failed at raising assets for TIG's investment funds, failed to understand or articulate the financial products he was charged with marketing, refused to learn basic computer technology to perform his job and failed to retain existing clients.  As a consequence of these shortcomings, Plaintiff was discharged. Further, Plaintiff was not who he represented himself to be when he was hired.  He was an imposter.  He presented a false resume, concealing that he had held 15 jobs in the financial services industry in his adult life and had been fired from almost all of them.  Moreover, Plaintiff has done precious little to

mitigate his alleged damages -- as he is required to do -- despite being let go in the midst of the explosion of the hedge fund industry, where jobs should be aplenty.

Plaintiff has alleged that he was discriminated against on the basis of his age because, *inter alia*, he was not promoted in 2000 to the Director of Marketing position at TIG and because his employment ended when he was 61 years old.  Plaintiff seeks damages in the form of back pay and front pay, compensatory damages for alleged emotional distress and punitive damages.

Since filing this action, Plaintiff has amended his Complaint twice, adding parties and claims under contract and quasi-contract theories for unpaid commissions as well as discriminatory retaliation for failure to pay those commissions.  At the time leave to amend was sought, Defendants contended in discussions with Plaintiff's counsel that amending the Complaint would be futile, but ultimately agreed to avoid burdening this Court with motion practice and in recognition that leave to amend is freely granted.  As Defendants anticipated, now that extensive (and expensive) discovery was conducted on the claims in Plaintiff's amended pleadings, it is clear that the very parties and claims which were added should be dismissed as a matter of law.  It also calls into question Plaintiff's motivation in seeking to amend, which appears to have been to increase the cost of this litigation in order to pressure Defendants into capitulating.

Additionally, Defendants seek to dismiss Plaintiff's claims for damages arising from the alleged failure to promote him in 2000 (because any such claim would be time-barred) and punitive damages (which are not available as a matter of law).  These excessive damages claims should be stricken before trial because not only would it be prejudicial to Defendants for a jury to consider damages that are not available as a matter of law, they will continue to create unrealistic expectations on behalf of the Plaintiff.  This case is simply about whether Plaintiff's employment ended for discriminatory reasons.  Regardless of whether there was intentional discrimination in this case -- and the facts will show there was not -- there is no evidence that there was any malice or reckless disregard

for Plaintiff's rights under the discrimination laws.  Indeed, the undisputed facts demonstrate the contrary.

This motion should be granted in its entirety.  First, there is no genuine issue of material fact that each of the defendants, damages or claims which are the subject of this motion should be dismissed from this action.  Second, leave to amend is freely granted where, as here, there would be no prejudice to the opposing party.[1]  Indeed, courts have routinely granted leave to amend to add the Statute of Frauds defense at summary judgment.  To grant this motion will streamline the issues for trial and leave only Plaintiff's claims of age discrimination arising from the termination of his employment under the Age Discrimination in Employment Act of 1967 (the "ADEA"), the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL") in the First, Third, Fifth, Seventh and Eighth causes of action.[2]

### Statement of Facts[3]

TIG hired Plaintiff in 1997 as a marketer to raise assets for its hedge funds.  Ex. 1, Shuman Tr. at 93:13-23, 95:12-96:6.[4]  As it happened, Plaintiff misrepresented his past in order to get hired by concealing on his resume a history of consistently being fired from some dozen jobs for performance reasons.  *Id.* at 25-36; 478-486.  During his employment, Plaintiff was paid a generous base salary ($175,000 per year at the time his employment ended) and, on a quarterly basis, commissions

---

[1]  Plaintiff's counsel refused to consent to the amendment of Defendants' Answer citing the need for discovery.  *See* Declaration of Anne C. Patin, Esq. dated January 27, 2006 (hereinafter "Patin Decl.") at ¶ 26.  Such refusal, however, is baseless as there is no prejudice to Plaintiff given that there has been extensive discovery on Plaintiff's contract and quasi-contract claims.  To amend the answer to assert a defense that has emerged from that very discovery would simply be conforming the proof to the pleadings.  *See infra* at pp. 24-25.

[2]  While Defendants do not seek to dismiss Plaintiff's claims of age discrimination arising from the termination of employment in this summary judgment motion, they respectfully reserve all rights to move at trial under Fed. R. Civ. P. 50 for judgment as a matter of law on these claims.

[3]  A complete version of the undisputed facts are set forth in the statement pursuant to Local Rule 56.1 that accompanies this motion.

[4]  All exhibits are attached to the Patin Decl. and referred to as "Ex. __."  Exhibits stamped "Confidential" are filed under seal pursuant to the Confidentiality Stipulation and Order, dated February 8, 2005.

from the assets he raised.  Ex. 2 (summary of terms of Plaintiff's employment).  Plaintiff never

performed services for, or raised assets for, Tiedemann Trust Company, a subsidiary in which TIG holds

a minority interest.  *Id.* at 581:18-21.  After TIG hired Charles F. Gulden as the Director of Marketing in

September 2000, Plaintiff reported to Mr. Gulden.  Ex. 1, Shuman Tr. at 160:9-21.

On September 30, 2002, the Executive Committee of Tiedemann Investment Group

(which included many of the individual Defendants named here) met to discuss, among other things, the

termination of Plaintiff's employment.  Ex. 3 (September 30, 2002 Agenda).  The agenda for the

meeting stated that Plaintiff's employment should end for the following reasons:

> Performance – he has raised $4.5 million over 2001 & 2002 net of
> redemptions.  Ineffective at getting through to a multitude of his
> "protected" list clients.  In the past week there have been three examples
> of his clients that didn't know we even had other than one product (AIG),
> Yankee Advisors, etc. and one that he didn't think invested in hedge funds
> and has over $1B (TIFF).  He has shown an unwillingness to work as a
> team player with [Mr. Gulden].  He has also shown an inability to change
> how he works, even though it is clear that he is not effective.  I think we
> give him his salary through year-end ($175,000), and compile a list of
> deals that he's been working on, which if closed in the next 6 months;
> he'll get paid on.

*Id.* at 5.

With no dissenters, a decision was reached at the meeting to conclude Plaintiff's

employment as of December 31, 2002.  Ex. 4, C. Tiedemann Tr. at 390:23-25.  At that time Plaintiff was

60 years old, and he turned 61 prior to year end 2002 when his employment at TIG officially ended.

Ex. 5 (Second Amended Complaint), at ¶¶ 6, 52.

At the September 30, 2002 meeting, defendant Carl H. Tiedemann, who was the

Chairman of the firm, and 76 years old himself at the time, insisted that he be the one to inform Plaintiff

of the decision.  Ex. 4, C. Tiedemann Tr. at 391:4-14.

On or about October 4, 2002, Carl Tiedemann met with Plaintiff to discuss Plaintiff's

separation from TIG.  *Id.* at 391:4-397:17.  As Mr. Tiedemann testified, every attempt was made to let

Plaintiff down as gently as possible when informing him of the decision and to assist Plaintiff in

securing new employment:

> Q:  Who told Tom that he was fired?

> A:  I did.

> Q:  Why did you tell him?

> A:  Well, at one point Michael [Tiedemann] said that he thought he ought to do it.  You know, he started functioning as quasi chief operating officer.
> And I said to him, look it, he is my friend.  I'm going to be the one to fire him.  I think that's just the honorable thing to do with him.  And –

Ex. 4, C. Tiedemann Tr. at 391:4-14.

At the meeting, Mr. Tiedemann saw that Plaintiff was upset by the news and attempted to

let Plaintiff down easy by providing Plaintiff with a possible explanation for Plaintiff's declining

performance.  *Id.* at 393:8-20, 394:12-395:11, 396:23-397:3.

> Q:  What did you mean by that?

> A:  Well, basically, and here I was canning the guy that I knew, I had known for a long time and liked a lot, and I don't like doing those things, and he was getting demoralized, understandably so, and discouraged, no one likes to be asked to leave, and I guess I was trying to rationalize.  I mentioned a subject that I thought it'd maybe make him feel better by saying that maybe the reasons your sales are falling off so, is that all these younger hot-shot money managers coming along and maybe you're having trouble relating to them.

> Q:  Relating to the money managers?

> A:  Relating to the investors, I meant to say, not the money managers.

Ex. 4, C. Tiedemann Tr. at 393:7-20.

> Q:  Is it fair to say that you believe that he may not have been able to relate to these other investors, these younger investors because of his age?

> A:  I said that to try and make him feel better.

> Q:  And that's what you believed, right?

> A:  No.  Because there are plenty of great sales out there that are a hell of a lot older than he is.  I'm selling to these people and I don't have a problem.

> Q:  But you told him that maybe because of his age was the reason why he couldn't relate to younger investors?

A:  Trying to give him some solace.

*Id.* at 395:18-396:11.

Subsequently, Mr. Tiedemann and Plaintiff met to discuss Plaintiff's termination over

breakfast, and Mr. Tiedemann again attempted to provide Plaintiff with solace regarding his termination.

*Id.* at 399:18-399:23, 400:20-402:6.

Q:  In that the clients are now younger?

A:  Well, yeah, and that he was maybe not relating to them, and I did that to make him feel better, not worse.

*Id.* at 400:2-6.

In January 2003 -- at Plaintiff's request -- Carl Tiedemann signed a letter of

recommendation for Plaintiff for the sole purpose of assisting Plaintiff in obtaining new employment.

*Id.* at 369:8-370:3.  Plaintiff now seeks to haunt Defendants with that good deed.

Q:  So you were trying to deceive other people when you wrote this letter?

A:  I wasn't as concerned about that as I was about taking a guy that had spent four years with us that I had to fire and help him out in getting another job.  And if I put down all those things, someone would probably decide not to do anything with him.

Q:  So you decided to hide those facts from other people?

A:  So I – will you let me finish my sentence, please.  So I sent the letter out.  Maybe I picked the wrong letter.  I must say in this interrogation I'm sorry I picked this particular letter, but I just wanted to get something out in support of him and helping him get another job.

*Id.* at 369:8-370:3.

In July 2003, Plaintiff filed a Charge of age discrimination with the Equal Employment

Opportunity Commission ("EEOC").  Ex. 6.  This lawsuit followed in April 2004.  Ex. 7.

<u>Argument</u>[5]

I.   **DEFENDANTS TIEDEMANN INVESTMENT GROUP (THE "UMBRELLA ENTITY"), TIEDEMANN INVESTMENT GROUP, INC. AND <u>TIEDEMANN TRUST COMPANY SHOULD BE DISMISSED FROM THIS ACTION</u>**

Tiedemann Investment Group, which is referred to as the "umbrella entity" in the Second Amended Complaint, Tiedemann Investment Group Inc. and Tiedemann Trust Company all should be dismissed as defendants from this action.

A.   **Tiedemann Investment Group (the "Umbrella Entity") <u>Is Not A Legal Entity Capable Of Being Sued</u>**

There is no genuine dispute here that Tiedemann Investment Group (referred to as the "umbrella entity" in the Second Amended Complaint) is a brand name used to describe the family of hedge funds that operate under the "Tiedemann" umbrella.  Ex. 8, Jelenek Tr. at 107:20-108:4.  It shares the same name with TIG, the general partnership (which is a legal entity) and Plaintiff's former employer.  It is not in and of itself an incorporated business or other form of legal entity.

Under Fed. R. Civ. P. 17(b), a party to litigation must have the capacity to sue or be sued.  *See* Fed. R. Civ. P. 17(b).  Federal courts look to the law of the state in which they sit to determine the legal capacity of an unincorporated party.  *See* Fed. R. Civ. P. 17(c).  Courts faced with the question of suing a "brand name" under New York law, the law to be applied here, routinely hold that claims cannot be sustained against them because they are not legal entities capable of being sued.  *See, e.g.*, *Bragg v. Emmis Broad. Corp.*, 1998 U.S. Dist. LEXIS 16290, *14 (S.D.N.Y. 1998) (dismissing claim brought against radio station call letters); *see also Little Shoppe Around the Corner v. Carl*, 363 N.Y.S.2d 784,

---

[5]   Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265 (1986); *Curtis v. Citibank, N.A.*, 70 Fed. Appx. 20, 21 (2d Cir. 2003) (affirming dismissal of discrimination and retaliation claims).  All ambiguities and inferences drawn from the underlying facts must be resolved in favor of the nonmovant.  *McCullough v. Financial Info. Servs. Agency*, 923 F. Supp. 54, 56 (S.D.N.Y. 1996) (Batts, J.) (granting summary judgment in Title VII action).  As this Court has noted, "viewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate."  *Id.* (quoting *Binder v. LILCO*, 933 F.2d 187, 191 (2d Cir. 1991)).

787 (Sup. Ct. Rockland Cty. 1975) (actions brought by or maintained against a trade name are a nullity);

*Marder v. Betty's Beauty Shoppe*, 239 N.Y.S.2d 923 (2d Dep't 1962) (no action can be commenced

against a business operating under a trade name because a trade name is a nullity); *Provosty v. Lydia E.*

*Hall Hosp.*, 457 N.Y.S.2d 106, 108 (2d Dep't 1982) (a trade name cannot sue or be sued independently

of its owner).

Accordingly, because the brand name "Tiedemann Investment Group" is not a legal

entity capable of being sued, it must be dismissed from this action.

**B.     Tiedemann Investment Group, Inc. Should Be Dismissed
         Because Plaintiff Cannot Demonstrate That Such An Entity Exists**

In the case of "Tiedemann Investment Group, Inc.," Plaintiff has adduced no evidence in

discovery that any entity exists or ever existed.  Indeed, the only reference to "Tiedemann Investment

Group, Inc." has been identified as a typographical error (*see* Ex. 8, Jelenek Tr. at 280:8-281:2) and

Plaintiff has not otherwise shown that "Tiedemann Investment Group, Inc." exists.  It should therefore

be dismissed from this action.

**C.     Tiedemann Trust Company Should Be Dismissed
         Because It Was Not Plaintiff's Employer**

Plaintiff admits that he did no work for Tiedemann Trust Company, a company in which

TIG owns a minority interest.  Ex. 1, Shuman Tr. at 581:18-21.  Notwithstanding that fatal admission,

Plaintiff seeks to hold that entity liable for the employment discrimination alleged here.

In an attempt to sidestep that fundamental problem, Plaintiff alleges that Tiedemann

Trust Company is liable under a "single employer" doctrine.  Second Am. Compl., ¶¶ 26, 28-34.

Plaintiff, however, fails to satisfy the requirements for a "single employer" here as a matter of law.

Under the "single employer" doctrine, a plaintiff may seek to hold liable two

economically interrelated companies for the discriminatory acts of the plaintiff's immediate employer.

*See, e.g., Frishberg v. Esprit De Corp.*, 778 F. Supp. 793, 800 (S.D.N.Y. 1991) (single employer

doctrine insufficient to hold parent company liable where plaintiff was president of subsidiary); *Balut v.*

*Loral Elec. Sys.*, 988 F. Supp. 339, 344 (S.D.N.Y. 1997) (granting summary judgment in favor of employer's parent company in ADEA action).  In the Second Circuit, "special circumstances" must exist in an employment discrimination context to apply the integrated enterprise doctrine and "[a] parent and subsidiary cannot be found to represent a single, integrated enterprise in the absence of evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control."  *Cook v. Arrowsmith*, 69 F.3d 1235, 1240 (2d Cir. 1995).[6] Although none of the four factors are themselves conclusive, centralized control of labor relations is the most critical factor because it involves which entity made the final employment decisions pertaining to the plaintiff claiming discrimination.  *See id.*, 69 F.3d at 1240; *Bragg*, 1998 U.S. Dist. LEXIS 16290, at *21-22 (approval by officer of parent company in subsidiary's employment decision insufficient to show centralized control of labor management); *Dewey v. PTT Telecom Netherlands, U.S., Inc.*, 1995 U.S. Dist. LEXIS 10028, *5 (S.D.N.Y. 1995) (granting defendant's motion to dismiss where plaintiff failed to establish that the parent and subsidiary constituted a single employer).

      Here, Tiedemann Trust Company cannot be, as a matter of law, a single employer with TIG because there is no genuine issue of material fact regarding the following:

- Plaintiff never worked for Tiedemann Trust Company or raised assets for that entity.  Ex. 1, Shuman Tr. at 581:18-21.

- Craig Smith, President of Tiedemann Trust Company, is the ultimate decision maker with respect to employment-related matters for the Trust Company without the involvement of TIG.  Ex. 9, declaration of Craig L. Smith, dated January 27, 2006 ("Smith Decl."), at ¶ 4.

- TIG is the parent company of Tiedemann Trust Company.  *Id.* at ¶ 3.

---

[6]    Plaintiff employees of a subsidiary company usually seek to apply the doctrine to hold a parent company liable as an employer.  *See, e.g.*, *Kellett v. Glaxo Enterprises, Inc.*, 1994 U.S. Dist. LEXIS 17021, *13-16 (S.D.N.Y. 1994) (plaintiff failed to establish an integrated enterprise with respect to defendant employer and the defendant's parent company and an affiliate where parent company created the affiliate to do many of the subsidiary's functions, prompting employer to fire five of its eight employees).  Here, Plaintiff attempts the precise opposite, asserting that the <u>subsidiary</u> Tiedemann Trust Company should be liable for the alleged discriminatory acts of the <u>parent</u> TIG.  Second Am. Compl., ¶ 26.

- Tiedemann Trust Company is separately incorporated, with its own bylaws, board of directors, and governance procedures.  *See*, *e.g.*, Exs. 10-18.

- Tiedemann Trust Company had no role in hiring, evaluating, disciplining or terminating Plaintiff here.  Ex. 9 (Smith Decl.), at ¶ 5.

Where, as here, there is no evidence of day-to-day control actually exercised by a parent over the subsidiary's day-to-day employment decisions, courts will routinely dismiss claims seeking to impose "single employer" liability.  *See*, *e.g.*, *Woodell v. United Way of Dutchess County*, 357 F. Supp. 2d 761, 769 (S.D.N.Y. 2005); *Balut*, 988 F. Supp. at 346.

Indeed, this Court, in *Bragg v. Emmis Broadcasting Corp.*, 1998 U.S. Dist. LEXIS 16290, *20-24 (S.D.N.Y. 1998), dismissed comparable claims where the purported interrelationship of the entities was that of a normal parent-subsidiary relationship.  In *Bragg*, a former employee of a radio station sued the corporate parent of his former employer for age and racial discrimination arising out of the employer's alleged failure to promote plaintiff and renew his contract.  *Id.* at *1-2.  The decision not to renew plaintiff's contract was made by the general manager of plaintiff's employer, who was also an officer of the parent company.  *Id.* at *21.  This Court held that, even if the general manager were acting on behalf, or at the direction, of the corporate parent, the parent company's review and approval of the subsidiary's employment decision would be insufficient to show centralized control of labor relations. *Id.* at *21.  The relationship between plaintiff's employer and the defendant was simply that of a subsidiary and its parent, which did not provide the basis for "single employer" liability.  *Id.*

Accordingly, because it is undisputed that Plaintiff performed no work for Tiedemann Trust Company or that the day-to-day employment functions of Tiedemann Trust Company were controlled by Plaintiff's employer Tiedemann Investment Group, this Court should grant summary judgment dismissing Tiedemann Trust Company from this action.  *See Herman v. Blockbuster Entm't Group*, 1999 U.S. App. LEXIS 11976, *4 (2d Cir. 1999); *Bragg*, 1998 U.S. Dist. LEXIS 16290, at *24.

II.     **ANY CLAIM FOR DAMAGES ARISING FROM THE ALLEGED
        FAILURE TO PROMOTE PLAINTIFF IN 2000 SHOULD BE DISMISSED
        AS A MATTER OF LAW BECAUSE IT IS TIME BARRED**

In his Second Amended Complaint, Plaintiff alleges that he was denied the opportunity to seek the "Director of Marketing" position in or about October 2000 on account of his age.  Second Am. Compl. ¶ 48.  As a result of this alleged non-promotion, Plaintiff now seeks over $100 million in damages from Defendants.  *See* Ex. 19 (Report on Lost Earnings of Thomas F. Shuman, Mark R. Killingsworth, dated October 14, 2005), at pp. 2-3.[7]  Any claim arising from the failure to promote, however, is untimely, and Plaintiff should not be able to seek damages as a result hereof at trial.

It is well-settled that a discrete discriminatory act -- such as the alleged non-promotion alleged here -- is time barred if a claim is not asserted during the relevant statute of limitations.  *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998); *Bailey v. Synthes*, 295 F. Supp. 2d 344, 353 (S.D.N.Y. 1997).  *See also Nat'l R.R. Passenger Corp. v Morgan*, 536 U.S. 101, 114, 122 S. Ct. 2061 (2002); *Costanzo v. The United States Postal Service*, 2003 U.S. Dist. LEXIS 4911, at *16 (S.D.N.Y. 2003).

First, any federal ADEA claim from the alleged non-promotion is barred because Plaintiff did not file his EEOC charge within 300 days of the alleged discriminatory act.  *Murphy v. General Electric Co.*, 245 F. Supp. 2d 459, 469 (N.D.N.Y. 2003) (claims under ADEA must be asserted in EEOC charge within 300 days of the alleged discrimination).  The statute of limitations on Plaintiff's "promotion" claim began to run on the date TIG hired Charles F. Gulden to the position of Director of

---

[7]     Plaintiff's expert report sets forth the resulting damages as follows:

Table 2 presents calculations that take account of the lost earnings arising from the fact that Mr. Shuman was not promoted in October 2000. The underlying assumptions in these calculations are similar to the ones used in Table 1. The major difference is that the calculations in Table 2 reflect the more generous commission and trailer commission structure, and the higher base salary, granted to the individual who actually received the position that Mr. Shuman hoped to receive. In Table 2, Mr. Shuman's total lost compensation up to age 75 is $83.582 million; and his lifetime lost earnings as of age 81 are $108.570 million.

Exhibit 19, at pp. 2-3.

Marketing, which was September 28, 2000.  See *Samuel v. Merrill Lynch Fenner & Smith*, 771 F.Supp. 47, 49 (S.D.N.Y. 1991) ("The accrual date of a claim based on the discriminatory denial of a promotion is the particular date on which the position is filled to the exclusion of Plaintiff."); Ex. 20.  (Consulting and Asset Introduction Agreement, dated September 28, 2000).  Plaintiff, however, did not file his Charge of Discrimination with the EEOC until July 24, 2003 -- long after the 300 day period to assert a claim based on the alleged failure to promote.  *See* Ex. 6 (Charge of Discrimination).  Thus, any federal ADEA claim for damages arising from the failure to promote him in late September 2000 is time barred.

Any state and local claim for the non-promotion is likewise untimely.  Claims under the NYSHRL and the NYCHRL must be brought within three years of the alleged discrimination.  *See* CPLR 213; *Bailey*, 295 F. Supp. at 352 (dismissing claims as untimely); *Walker v. Connetquot Cent. School Dist. of Islip Cent. Offices*, 2000 U.S. App. LEXIS 14620, at *4 (2d Cir. 2000).  After receiving a right to sue letter from the EEOC on February 4, 2004 (Ex. 5, Second Am. Compl. ¶ 23), Plaintiff did not commence this action until April 29, 2004 -- more than three and a half years after Defendants purportedly discriminated against him by failing to offer him the position of Director of Marketing.  *See* Ex. 7 (Plaintiff's Complaint). [8]  Because it is undisputed that Plaintiff filed his state and local law claims more than three years after the alleged failure to promote, they must be dismissed as to all Defendants. *Bailey*, 295 F. Supp. 2d at 352.

III.    **PLAINTIFF'S CLAIMS FOR UNPAID COMMISSIONS
        AND RETALIATION FAIL AS A MATTER OF LAW**

In the Second Amended Complaint, Plaintiff alleges claims alleges that Defendants should have paid him a 20 basis point[9] commission (rather than the 10 basis point commission he was in

---

[8]    Even if Plaintiff's claims were tolled during the pendency of Plaintiff's EEOC charge (which, as noted above, was untimely with respect to any claim under the ADEA for failure to promote), the alleged non-promotion would still be time-barred.  *See, e.g. Lee v. Overseas Shipholding Group, Inc.*, 2001 U.S. Dist. LEXIS 10622, at *27-28 (S.D.N.Y. 2001).

[9]    A "basis point" is one-one hundredth of a percentage point.

fact paid) on an investment made by Howard Hughes Medical Institute ("Howard Hughes") in April

2004 (some 18 months after Plaintiff's employment ended) pursuant to an alleged agreement

purportedly governing the payment of commissions after Plaintiff's employment ended.  *See* Ex. 5,

Second Amended Complaint at ¶¶ 64-67 (asserting claims for breach of an express or implied contract

(Ninth Cause of Action), unjust enrichment (Tenth Cause of Action), quantum meruit (Eleventh Cause

of Action) and violation of the New York Labor Law §§ 190 et seq.)  Plaintiff also alleges that the

failure to pay the full commission amount constituted unlawful retaliation by Defendants under the

ADEA as well as the NYSHRL and NYCHRL based on the failure to honor the same alleged agreement.

*Id.* at ¶¶ 77-79, 84-85, 91-93 (Second, Fourth and Sixth Causes of Action).  Plaintiff's claims fail

because: the alleged agreement on which they are based is barred by the Statute of Frauds; there is no

agreement that would obligate Defendants to pay commissions on investments made <u>after</u> June 30, 2003

by any client Plaintiff introduced during his employment; and there can be no retaliation claim as a

matter of law.

 The following material facts are undisputed:

- During his employment, Plaintiff was paid a base salary and, on a quarterly basis, commissions based on the assets he raised.  *See* Ex. 2.

- Plaintiff's commissions during his employment were paid at the rate of 20% of the 1% management fee (20 basis points) on assets raised in the first year of an investment made by an investor introduced by Plaintiff.  After the first year, the commission was paid at the rate of 10% of the 1% management fee (10 basis points) for so long as the assets remained invested in a TIG fund.  *Id.*[10]

- Howard Hughes, a client Plaintiff introduced to TIG who had made a substantial investment, redeemed $20 million in July 2002 (during the time that Plaintiff was employed).  Ex. 8, Jelenek Tr. at 74:20-75:15.

- At the time Howard Hughes Medical redeemed $20 million in July 2002, Plaintiff was receiving a trail commission at the rate of 10% of the 1% fixed management fee (10 basis

---

[10]     By way of example, if any investor Plaintiff introduced to TIG invested $10 million, Plaintiff's commission in the first year (at 20 basis points) would be $20,000, paid in $5,000 installments each quarter.  After the first year, the commissions would be $10,000 per year (at 10 basis points) paid in $2,500 installments each quarter, so long as the assets remained at TIG (assuming there was no appreciation on the assets).

- 13 -

points) because those assets had been invested for more than one year.  *See* Ex. 2; Ex. 8, Jelenek Tr. at 75:9-15.

- In connection with Plaintiff's separation from employment, TIG proposed to pay Plaintiff commissions on certain investments made by Plaintiff's clients in the six-month window following the termination of his employment (through June 30, 2003).  Ex. 21, M. Tiedemann Tr. at 279:4-280:5; Ex. 3, at p. 5.

- On or about December 31, 2002 (the date Plaintiff's employment officially ended) Plaintiff prepared a written document purported to outline the terms of his commission payments for the period following the termination of his employment (the "December 31, 2002 Memo").  *See* Ex. 22.

- The December 31, 2002 Memo in part provides that "Additional assets to existing clients will be credited with the First Year Finders Incentive – 20% of 1% Fixed Management Fee on Assets Introduced," with no time limit on when those "additional assets" would be invested and require TIG to pay a commission.  *Id.*

- The December 31, 2002 Memo was not prepared by Defendants and was never signed by any of the Defendants, the parties whom Plaintiff claims should be charged here.  *Id.*; *see also* Ex. 21, M. Tiedemann Tr. at 312:5-14; Ex. 8, Jelenek Tr. at 63; 23-64:8.

- There is no writing or memorandum prepared by or signed by any Defendant that provides any terms regarding commission payments to Plaintiff for new investments made after June 30, 2003.

- Howard Hughes Medical reinvested $20 million into one of TIG's funds as of April 1, 2004 (some 18 months after Plaintiff's employment ended).  Ex. 8, Jelenek Tr. at 75:16-19.

- After consulting with counsel, Laurie Jelenek, who was responsible for calculating Plaintiff's commissions (and is not an individual defendant here), decided to pay Plaintiff a trail commission on the Howard Hughes Medical investment made in April 2004 in the amount of the 10% of the 1% management fee (10 basis points) because it constituted replacement of previously redeemed funds.  *See id.* at 33:15-20; 75:16-76:6.  However, Ms. Jelenek did not believe that Plaintiff was entitled to be paid any amounts, even 10 basis points.  *Id.* at 71:8-16.  However, it had been TIG practice to pay for marketers who were still employed to pay commissions on funds that had been redeemed and then reinvested at a later date at the rate at which the commission was paid at the time of redemption.  *Id.* at 76:13-77:3.

- Following the end of Plaintiff's employment at TIG on December 31, 2002,  TIG never paid Plaintiff at the rate of 20% of the fixed 1% management fee (20 basis points) on any additional investment made by a client who had been introduced by Plaintiff during his employment.  *Id.* at 74:14-18; 89:3-90:4.

- In November 2005, Plaintiff commenced a state court action seeking payment of commissions for the period prior to this lawsuit being commenced.  *See* Ex. 23.

Notwithstanding the foregoing undisputed facts, Plaintiff contends that he is entitled to a

20 basis point (rather than 10 basis point) commission on the Howard Hughes investment because that

constituted a new investment from a client he had introduced to TIG -- regardless of the fact that the investment was made long after (and probably because) his employment ended.  Taking Plaintiff's theory to the logical extreme, what he is really saying is he should be paid a commission every time an investor with which he was credited invests -- even if that investment is made 20 years from now, decades after his employment ended.  To state the proposition is to state the result: Plaintiff's claims must be dismissed.

A.    **Plaintiff's Claims For Unpaid Commissions**
      **Are Barred By the Statute of Frauds_____**

Plaintiff bases his claims for payment of additional commissions on the Howard Hughes investment on his December 31, 2002 Memo, which was not signed by any Defendant, and purports to create an obligation to pay commissions on "additional assets" that may be invested in TIG funds, regardless of when those investments are made.  Because the December 31, 2002 Memo purports to create an obligation to pay commissions for an indefinite period of time and is not signed by the party to be charged, it is an unenforceable contract under the Statute of Frauds.  *See* N.Y. Gen. Oblig. Law 5-701(a)(10);[11] *Zupan v. Blumberg*, 2 N.Y.2d 547, 550-552, 161 N.Y.S.2d 428, 429-432 (1957) (holding an oral employment contract of indefinite duration to procure advertising business on a commission basis violates the Statute of Frauds); *Kalfin v. United States Olympic Comm.*, 209 A.D.2d 279, 280, 618 N.Y.S.2d 724, 725 (1st Dep't 1994) (holding an oral agreement to pay plaintiff commissions invalid

_____

[11] N.Y. Gen. Oblig. L. 5-701(a)(10) provides, in relevant part:

§ 5-701.  Agreements required to be in writing

a.      Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

(10) Is a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest.

N.Y. Gen. Oblig. L. 5-701(a)(10).

because of the indefinite time period); *Agee v. Read Q Systems, Inc.*, 70 A.D.2d 805, 805, 417 N.Y.S.2d 494, 495 (1st Dep't 1979) (holding unenforceable under the Statute of Frauds an oral agreement obligating defendant to pay plaintiff commissions indefinitely for consultations arising from plaintiff's sale of computer equipment and purchases of equipment by plaintiff's customer); *Caruso v. Malang, Jr.*, 250 A.D.2d 800, 800-801, 673 N.Y.S.2d 470, 471 (2d Dep't 1998) (an oral agreement to pay renewal commissions following termination of the parties' at-will employment relationship was unenforceable); *Hausen v. Acad. Printing & Specialty Co., Inc.*, 34 A.D.2d 792, 793, 311 N.Y.S.2d 613, 613 (2d Dep't 1970) (an oral agreement obligating payment of commissions on completed sales on original orders, or on reorders, was unenforceable because obligation would continue as long as customers reorder).

Nor do the alleged terms of the December 31, 2002 Memo fit an exception to the Statute of Frauds that it is "capable of performance within one year."   N.Y. Gen. Oblig. L. 5-701(a)(1).  To the contrary, the December 31, 2002 Memo, by its purported terms, is not terminable at will and Defendants' obligations are triggered by the actions of third parties, here investors in TIG funds.  *See Apostolos v. R.D.T. Brokerage Corp.*, 559 N.Y.S.2d 295, 297 (1st Dep't 1990) (holding that "a promise to pay commissions that extends indefinitely, dependently solely on the acts of a third party and beyond the control of the defendant, is within the statute").

Plaintiff attempts to avoid the Statute of Frauds problem by asserting claims for the alleged unpaid commissions under theories of quantum meruit and unjust enrichment.  Second Am. Compl., ¶¶ 109-127.  However, those claims -- just as Plaintiff's contract claims -- are barred by the Statute of Frauds.  *See Goldmark Assoc., Inc.* v. *Technical Erectors, Inc.*, 1990 U.S. Dist. LEXIS 7323, *14 (S.D.N.Y. 1990) (explaining that writing requirement applies to claims of breach of contract, quasi-contract, quantum meruit and unjust enrichment and dismissing plaintiff's claims of owed sales commissions where the writing was insufficient).  In the absence of any writing signed by or even prepared by the parties sought to be charged, claims of quantum meruit and/or unjust enrichment arising

- 16 -

from alleged oral agreements are barred. *Koch v. Multiplan, Inc.*, 2001 U.S. Dist. LEXIS 2142, *16 (S.D.N.Y. 2001).

In *Koch v. Multiplan, Inc.*, the court granted defendant's motion to dismiss plaintiff's quasi-contract claims. 2001 U.S. Dist. LEXIS at *16. Plaintiff argued she was entitled to commissions based on an alleged agreement with defendants, but the court rejected her theories of both breach of contract and quantum meruit/unjust enrichment. In dismissing plaintiff's claims, the court noted that there was a lack of any writing signed by the defendants. *Id.* at *15; *see also Karlin v. Avis,* 457 F.2d 57, 62 (2d Cir. 1972) (affirming summary judgment for defendants where writings pointed to by plaintiff were insufficient for holding defendants liable for a finder's fee because "[i]n New York, unsigned writings prepared by a plaintiff, without more, do not suffice to bind a defendant."); *Whitman Heffernan Rhein & Co, Inc. v. Griffin Co.*, 163 A.D.2d 86, 87, 557 N.Y.S.2d 342, 343 (1st Dep't 1990) (barring plaintiff's claims of breach of contract and quantum meruit where plaintiff cited an unsigned, allegedly final draft of an agreement between himself and the defendant as evidence of defendant's obligation to pay him a performance fee).

For these reasons, Plaintiff's Ninth, Tenth, Eleventh and Twelfth causes of action alleging claims for breach of contract, quantum meruit, unjust enrichment and violation of the New York Labor Law §§ 190 et seq.

## B.      As A Matter of Law The Alleged Failure To Pay Commissions Is Not Retaliation

The elements of a claim of unlawful retaliation in a discrimination context include that (1) the employee was engaged in a protected activity; (2) that the employer was aware of that activity; (3) that there occurred an employment action adverse to the employee; and (4) that there existed a causal connection between the protected activity and the adverse employment action. *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir. 1990). Here, Plaintiff cannot satisfy the third and fourth elements of a retaliation claim that because there was no "adverse employment action" as a matter of

law, and there can be no causal connection between his filing of the lawsuit and Defendant's alleged failure to pay a 20 basis point commission as opposed to a 10 basis point commission as a matter of law.

First, because the December 31, 2002 Memo does not satisfy the Statute of Frauds (*see* pp. 15-17 *supra*), the failure to pay Plaintiff a "full" commission on the Howard Hughes investment was not an adverse employment action. *Garber v. New York City Police Dep't*, 1998 U.S. App. Lexis 20181 (2d Cir. 1998) (transfer or minor change in working conditions, without a reduction in pay, is not an adverse employment action). At no time did Plaintiff suffer a reduction in pay to which he was entitled because there is no written, enforceable agreement upon which Plaintiff can claim a legitimate expectation of payment. Rather, the payment of any commission at all was a windfall to Plaintiff -- not reduced pay -- because he was never <u>entitled</u> to commissions for investments made after termination of his employment.[12]

Second, because Plaintiff had no such right to the commissions in the first instance, there can be no causal connection between the filing of this action and the failure to pay the 20 basis point commission on Howard Hughes. *See Rose v. Green*, 1998 U.S. App. LEXIS 12941, *4 (2d Cir. 1998) (plaintiff failed to establish connection between the filing of his EEOC charge and his subsequent discontinuation of salary supplement payments because plaintiff received his payments for as long as he was entitled); *see also Hollander*, 895 F.2d at 85 (affirming trial court's grant of summary judgment on plaintiff's retaliation claim where plaintiff lacked evidence of causal nexus between the filing of age discrimination complaint and subsequent discharge).[13] In the absence of any enforceable right to be paid additional amounts on the Howard Hughes investment, Plaintiff cannot establish, as a matter of law, that the failure to pay those commissions was causally related to his filing of this action.

---

[12]     At best, Plaintiff would be entitled to commissions for investments made by certain clients in the six-month window following his employment based on TIG's proposal at the time Plaintiff's employment ended. Ex. 21, M. Tiedemann Tr. at 279:4-280:5; Ex. 3, at p. 5.

[13]     Retaliation claims are subject to the McDonnell Douglas burden shifting analysis. *Naftchi v. New York University*, 14 F. Supp. 2d 473, 489 (S.D.N.Y. 1998).

Rather, as Ms. Jelenek testified, TIG did not believe that Plaintiff was entitled to <u>any</u> payments arising from the April 2004 investment by Howard Hughes, but in the abundance of caution consulted with counsel and decided to pay the trailing commission rate of 10 basis points.  Ex. 8, Jelenek Tr. at 71:8-16.  Ms. Jelenek testified that she viewed the investment "replacement of redeemed funds" (*id.* at 75:16-76:6) because it had been TIG practice for marketers who were still employed to pay a commission on funds that had been redeemed and later reinvested at the rate of commission being paid at the <u>time of redemption</u>.  *Id.* at 76:13-77:3.  In the absence of any obligation to pay Plaintiff either (a) the rate paid on new investments during his employment (20 basis points) or (b) the rate of 10 basis points paid on trailing commissions since the investment had been redeemed two years earlier (before Plaintiff's employment ended), the payment of even a 10 basis point commission was charitable, not retaliatory as Plaintiff alleges.

Finally, Plaintiff's filing of a state court action seeking recovery of commissions only under contractual theories from the period prior to the commencement of this action demonstrates that Plaintiff believes the same conduct occurred prior to his asserting these discrimination claims.  *See* Ex. 23 (state court complaint in *Shuman v. Tiedemann Investment Group, et al.*, Sup. Ct., N.Y. Cty., Index No. 116629-05).  Clearly, this entirely undermines Plaintiff's "retaliation" theory because he claims -- albeit falsely -- that TIG engaged in the same conduct (failure to calculate his commissions properly) before and after this action was commenced.

For these reasons, the retaliation claim should be dismissed as a matter of law.

## IV.    PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES SHOULD BE STRICKEN

In his Second Amended Complaint, Plaintiff seeks "an award of punitive damages" without specifying the causes of action for which he seeks punitive damages or the alleged basis for awarding such damages.  Ex. 5, at p. 33.  For the reasons set forth below, Plaintiff's punitive damages claim should be stricken.

**A.**     **Punitive Damages Are Unavailable Under the ADEA and the NYSHRL**
         **And Cannot Be Sought Under the NYCHRL In Age Discrimination Cases**

It is well-settled that punitive damages are not available under the ADEA. *See Comm'r v. Schleier*, 515 U.S. 323, 336, 115 S. Ct. 2159, 2167 (1995) ("Monetary remedies under the ADEA are limited to back wages, which are clearly of an 'economic character,' and liquidated damages, which we have already noted serve no compensatory function."); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1191 (2d Cir. 1992).  Nor are punitive damages available under the NYSHRL.  N.Y. Exec. Law § 297(9) ("Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages, including, in cases of housing discrimination only, punitive damages, and such other remedies as may be appropriate); *Thoreson v. Penthouse Int'l*, 80 N.Y.2d 490, 499 (1992) ("In sum, we agree with the Appellate Division that punitive damages are not permitted in a court action pursuant to Executive Law § 297 (9).").  Accordingly, Plaintiff's claims for punitive damages under the state and federal anti-discrimination provisions must be dismissed.

Recognizing the federal prohibition on punitive damages for ADEA claims, the district court in *Chambers v. Capital Cities*, 851 F. Supp. 543 (S.D.N.Y. 1994), addressed the issue of whether punitive damages under the NYCHRL were preempted by federal law.  *Id.* at 545-546.  Because the ADEA does not contain an explicit preemption provision, the court held that the NYCHRL would not be deemed preemptive to the extent it did not frustrate the objectives and policies behind the federal statutory provisions.  *Id.* at 545.  The court noted that the ADEA encouraged the "consensual resolution of issues" between employers and employees and "informal settlement efforts prior to litigation."  *Id.* at 546.  The court then held that the possibility of punitive damages under the NYCHRL acted to encourage litigation – rather than settlements – and would undermine the ADEA's policy in favor of such settlements:

> The addition of punitive damages to a remedial structure would be a major
> shift encouraging litigation rather than settlements: the City law in fact
> explicitly bars its own application, including claims for punitive damages,

if a complaint has been filed with either the City Commission on Human Rights or the State Division of Human Rights.  The presence of punitive damage incentives for pursuing lawsuits to the bitter end, combined with the City law's specific discouragement of resort to agencies which can mediate disputes, would undermine the federal objectives.  Inclusion of punitive damages in such circumstances would tend to obliterate resort to mediation and cause the City law to trump all other antidiscrimination laws, driving out resort to their procedures.

*Id.*

Because punitive damages are not available as a matter of law for age discrimination claims under the ADEA, the NYSHRL and the NYCHRL, Plaintiff's claim for punitive damages should be stricken.[14]

**B.    Even If Punitive Damages Were Available, Plaintiff Fails
To Satisfy The Standard for Such An Award**

Even if this Court were to decline to adopt the holding in *Chambers* regarding the availability of punitive damages for age discrimination claims, Plaintiff's claim for punitive damages should nevertheless be dismissed.  New York courts addressing punitive damages under the NYCHRL have adopted the standard set forth in *Kolstad v. Ada,* 527 U.S. 526, 119 S. Ct. 2118 (1999).  *See Chapkines v. N.Y. Univ.,* 2004 U.S. Dist. LEXIS 2990 at *19 (S.D.N.Y. 2004).  Under *Kolstad,* a showing of intentional discrimination is insufficient to state a claim for punitive damages.  *Kolstad*, 527 U.S. at 536-537.  Instead, a plaintiff must show that "the employer has engaged in intentional discrimination and has done so with 'malice or with reckless indifference to the federally protected rights of an aggrieved individual.'"  *Id.* at 529-530.  "Malice" and "reckless indifference" refer to "the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination."  *Id.* at 535.  The court explained that "an employer's conduct need not be independently 'egregious' to satisfy § 1981a's requirements for a punitive damages award, although

---

[14]        To the extent other cases in the Southern District of New York may not have not followed *Chambers* (*see Chapkines v. New York University,* 2004 U.S. Dist. LEXIS 2990 (S.D.N.Y. 2004), *Knutson v. Brounstein,* 2001 U.S. Dist. LEXIS 21573 (S.D.N.Y. 2001), Defendants respectfully submit that the reasoning in *Chambers* is sound and should be dispositive here.

evidence of egregious misconduct may be used to meet the plaintiff's burden of proof."  *Id.* at 546.

Here, plaintiff's claim of age discrimination amounts to, at most, intentional discrimination, not malice

or reckless disregard for his rights.

### 1.      There Is No Evidence of Malice

Taking as true Plaintiff's allegations of intentional discrimination (as Defendants must

for the purposes of this motion), the alleged conduct in this case does not rise to the level of malice as a

matter of law.  In fact, the facts demonstrate the opposite.

This is a straightforward case of alleged employment discrimination, not a punitive

damages case.  Plaintiff alleges that he was not promoted and he was ultimately terminated because of

his age.  Second Am. Compl., ¶¶ 48, 53.  He further alleges that during his employment, there was age-

based commentary directed at him in the workplace, but fails to connect that alleged commentary to the

actual decision to terminate his employment in 2002.[15]  *Id.*, ¶¶ 45-46 (alleging that he was harassed by

"young" portfolio managers and that he was told by them that he was "out of touch" because he was

"too old").  Ironically, Plaintiff's main support for his claim that he was discriminated against arises out

of conduct that was, in fact, meant to "soften the blow" of the news of the termination of his

employment and otherwise meant to help him out.[16]

Specifically, Plaintiff alleges that he was told by defendant Carl H. Tiedemann, Chairman

of TIG who at the time was 76 years old himself, in sum or substance explained that the reason Plaintiff

might not be successful in raising money for TIG was his inability to forge relationships with younger

clients and investors.  Second Am. Compl., ¶¶ 53-54, 57.  Even more paradoxically, Plaintiff alleges as

---

[15]      There has been no evidence adduced in discovery or otherwise that Plaintiff's allegations of age-based comments directed at him are supported.  Further, Plaintiff admits that he never told anyone at TIG that his co-workers were making age based comments.  Ex. 1, Shuman Tr. at 328:4-332:8.

[16]      Nor can the fact that the agenda prepared for the meeting in which the decision to terminate Plaintiff's employment was made referencing the word "retire" support malice.  Indeed, Defendants contend that the word "retire" was used as a euphemism for the term "fire" and, in any event, the performance-based reasons for Plaintiff's termination were clearly set forth therein.  *See* Ex. 3, at p. 5.

evidence of Defendants' wrongdoing, that Mr. Tiedemann wrote Plaintiff a glowing letter of recommendation -- at Plaintiff's request -- to assist in his job search. *Id.*, ¶¶ 58-59.

Defendants submit that even if Plaintiff's allegations regarding his conversation with Mr. Tiedemann and the letter of recommendation are true (or relevant to whether the decision to terminate Plaintiff's employment was based on Plaintiff's age), these allegations mitigate against any claim for punitive damages. In fact, these allegations support precisely the contrary – that Plaintiff's employment was terminated and Defendants tried to let Plaintiff down easy and help him get a new job. As a matter of law, this conduct does not constitute malice and the issue of whether punitive damages should be awarded should not be part of a trial.

### 2.      There Is No Evidence That There Was Reckless Disregard For Plaintiff's Protected Rights

The Second Circuit has interpreted *Kolstad* to require that a plaintiff show that a defendant acted in spite of a "perceived risk" requirement that it was violating plaintiff's rights. *See Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 235-236 (2d Cir. 2000). This requirement is strictly construed, and evidence of intentional discrimination alone is insufficient. *Id.* (vacating jury award of punitive damages where there was no perceived risk that defendant's actions would violate federal law and defendant terminated plaintiff as a way "to protect itself against the possible long-term absence of an employee").

Nowhere, however, does Plaintiff allege -- or is there any fact to suggest -- that any of Defendants participated in the decision to terminate Plaintiff's employment being cognizant that it would violate the discrimination laws. Nor are there any facts that would show that the termination of Plaintiff's employment rose to the level of egregious conduct sufficient on its own to sustain a claim for punitive damages as to all Defendants. *Cf. Knutson*, 2001 U.S. Dist. LEXIS 21573, at *19 (refusing to dismiss punitive damages claims where plaintiff alleged consistent harassment by fellow employees

over a period of time, several meetings with employer's human resources department and plaintiff's

managers regarding the alleged harassment and employer's failure to take any action).

In sum, none of the allegations or evidence reflects acts on the part of the Defendants

taken in spite of a "perceived risk" of violating the securities laws.  Should this Court hold that punitive

damages are available for claims of age discrimination under the NYCHRL, this Court should

nonetheless hold that, as a matter of law, punitive damages are unavailable in the instant case.

## V.    LEAVE TO AMEND DEFENDANTS' ANSWER TO INCLUDE THE STATUTE OF FRAUDS AS AN AFFIRMATIVE DEFENSE SHOULD BE GRANTED

Defendants seek leave to amend their answer to the Second Amended Complaint to

include an affirmative defense that the Statute of Frauds bars Plaintiff's Ninth, Tenth, Eleventh and

Twelfth Causes of Action.  Ex. 24 (Proposed Amended Answer to Amended Complaint), at p. 10.[17]

Federal Rule of Civil Procedure 15(a) provides that "leave [to amend] shall be freely given when justice

so requires."  Fed. R. Civ. P. 15(a); *see Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 402 (2d Cir.

2001).  In the absence of prejudice to plaintiff or bad faith on the part of defendant, courts will permit

defendants to assert affirmative defenses for the first time when filing a summary judgment motion.

*See, e.g.*, *Gates v. BEA Assoc., Inc.*, 1990 U.S. Dist. LEXIS 15299, at * 25 (S.D.N.Y. 1990) (permitting

defendant to add Statute of Frauds defense on summary judgment motion); *Topo v. Dhir*, 2003 U.S.

Dist. LEXIS 21937, at *4 (S.D.N.Y. 2003) (granting defendant leave to amend answer to add

affirmative defense of Statute of Frauds); *Royal Ins. Co. v. DHL Worldwide Express*, 1999 U.S. Dist.

LEXIS 10530, at *20-21 (S.D.N.Y. 1999) (allowing defendant to assert affirmative defense on summary

judgment motion where plaintiff was not prejudiced).

Here, Plaintiff's commission claims, which were raised in August 2005, were the subject

of extensive discovery in this case, and witnesses were specifically questioned about the December 31,

---

[17]    Counsel for Plaintiff citing the need for discovery, refused to consent to Defendants proposed amendment to their Answer to the Second Amended Complaint.  Patin Decl., ¶ 8 & Ex. 25.

2002 Memo.  *See, e.g*, Ex. 21, M. Tiedemann Tr. at 312:5-14; Ex. 8, Jelenek Tr. at 62:3-74:19.  Indeed, it would be unjust to Defendants to deny them leave to amend to assert an affirmative defense learned about in discovery.  Plaintiff is therefore unable to demonstrate any prejudice whatsoever were Defendants to assert the Statute of Frauds defense at this time.  *See  Vestrock Partners v. California Energy Co.*, 1993 U.S. Dist. LEXIS, at *11-13, 24 (S.D.N.Y. 1993) (granting leave to amend answer to include Statute of Frauds as affirmative defense and holding that purported contract did not satisfy Statute of Frauds).  Accordingly, Defendants should be granted leave to file the proposed amended Answer to the Second Amended Complaint.

### Conclusion

For all the foregoing reasons, the Court should grant Defendants' motion for leave to amend the Answer to the Second Amended Complaint and for partial summary judgment, and grant such other and further relief as it deems just and proper.

New York, New York
January 27, 2006

Respectfully Submitted,

SEWARD & KISSEL LLP

By:  /s/  Anne C. Patin
    Mark J. Hyland (MH-5872)
    Anne C. Patin (AP-6155)
    Thomas Ross Hooper (TH-4554)

    One Battery Park Plaza
    New York, New York  10004
    (212) 574-1200

    Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I, Anne C. Patin, an attorney duly admitted, hereby certify that on January 27, 2006, I electronically filed the foregoing Defendants' Memorandum of Law in Support of Their Motion for Partial Summary Judgment and Leave to Amend Their Answer with the Clerk of the Court by using the CM/ECF system.  I further certify that I electronically served (and caused to be served by hand) the foregoing document on the following CM/ECF participant:

> Douglas H. Wigdor, Esq.
> Thompson Wigdor & Gilly LLP
> 350 Fifth Avenue, Suite 5720
> New York, New York  10118

_____/s/ Anne C. Patin___
Anne C. Patin (AP-6155)

New York, New York
January 27, 2006

SK 79575 0078 638514