**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

THOMAS F. SHUMAN,

                         Plaintiff,

            v.

TIEDEMANN INVESTMENT GROUP;
TIEDEMANN INVESTMENT GROUP;
TIEDEMANN INVESTMENT GROUP, INC.;
TIEDEMANN & CO.; TIEDEMANN TRUST
COMPANY; CARL H. TIEDEMANN
in his official and individual capacities;
BRUCE T. PROLOW in his official and
individual capacities; MICHAEL TIEDEMANN
in his official and individual capacities;
BARBARA WARGA NARATIL in her official
and individual capacities; C. HANS TIEDEMANN
in his official and individual capacities;
DREW FIGDOR in his official and individual
capacities; JAMES C. AYER in his official and
individual capacities; DOMINIC MOROSS
in his official and individual capacities;
STEVE DIAMOND in his official and individual
capacities; and GREGORY VAN KIPNIS in his
official and individual capacities,

                       Defendants.

04 CV 3263 (DAB)
ECF CASE

------------------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

THOMPSON WIGDOR & GILLY LLP
Kenneth P. Thompson (KT-6026)
Douglas H. Wigdor (DW-9737)
Andrew. S. Goodstadt (AG-2760)

Empire State Building
350 Fifth Avenue - Suite 5720
New York, New York 10118
Tel. (212) 239-9292

February 24, 2006                  Counsel for Plaintiff

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS     i

TABLE OF AUTHORITIES     iii

PRELIMINARY STATEMENT     1

STATEMENT OF MATERIAL FACTS     3

ARGUMENT     8

I.    DEFENDANTS HAVE FAILED TO MEET THE STANDARDS FOR SUMMARY JUDGMENT AND THEIR MOTION SHOULD BE DENIED     8

II.    PUNITIVE DAMAGES ARE AVAILABLE TO PLAINTIFF UNDER THE NYCHRL FOR DEFENDANTS' INTENTIONAL, WILLFUL AND MALICIOUS HARASSMENT, DISCRIMINATION AND RETALIATION     8

     A.    The NYCHRL Provides For An Award Of Punitive Damages For Claims Of Age Discrimination.     9

     B.    Plaintiff Is Entitled To An Award Of Punitive Damages Because Defendants' Intentional Violations Of The NYCHRL Were Willful, Wanton And In Reckless Disregard Of Plaintiff's Statutorily Protected Rights.     12

         1.    Defendants Acted With Malice.     13

         2.    Defendants Acted In Reckless Indifference To Plaintiff's Statutorily Protected Rights.     15

III.    MATERIAL ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT WITH RESPECT TO TIEDEMANN INVESTMENT GROUP (THE UMBRELLA ENTITY), TIEDEMANN INVESTMENT GROUP, INC. AND TIEDEMANN TRUST COMPANY     18

     A.    Tiedemann Investment Group and Tiedemann Trust Company Constitute A Single Employer.     18

     B.    Material Issues Of Fact Preclude A Finding That Tiedemann Investment Group (The Umbrella Entity) And Tiedemann Investment Group, Inc. Are Legally Capable Of Being Sued.     21

IV.    PLAINTIFF'S FAILURE TO PROMOTE CLAIMS WERE TIMELY FILED UNDER THE NYSHRL AND NYCHRL     21

i

V.    PLAINTIFF'S CLAIMS FOR UNPAID COMMISSIONS AND
      RETALIATION ARE NOT BARRED AS A MATTER OF LAW                    23

      A.    Defendants Waived Their Affirmative Defense of Statute of Frauds.    24

      B.    Defendants' Request To Amend Answer To Include Statute Of Frauds
            As Affirmative Defense Should Be Denied Because Defendants Have
            Not Demonstrated "Good Cause" For Their Failure To Plead Such
            Defense In Their Answer.                                             24

      C.    Questions of Material Fact Preclude Summary Judgment With
            Respect to Plaintiff's Claims Of Unlawful Retaliation.               26

CONCLUSION                                                                       30

# TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE**

AM Cosmetics Inc. v. Solomon,
    67 F. Supp. 2d 312 (S.D.N.Y. 1999)                              24

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)                                             8

Baldwin County Welcome Ctr.,
    466 U.S. 147 (1984)                                             23

Benjamin v. United Merchants and Mfrs., Inc.,
    873 F.2d 41 (2d Cir. 1989)                                      17

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)                                             8

Chambers v. Capital Cities,
    851 F. Supp. 543 (S.D.N.Y. 1994)                                10, 11

Chapkines v. NYU,
    02 Civ. 6355, 2004 U.S. Dist. LEXIS 2990 (S.D.N.Y. Feb. 25, 2004)   9, 12

Classicbury Ltd. v. Musicmaker.com, Inc.,
    01 Civ. 1756, 2001 WL 1658241 (S.D.N.Y. Dec. 26, 2001),
    aff'd, 48 Fed. Appx. 360 (2d Cir. 2002)                         25, 26

Collings v. Indus. Acoustics Co.,
    99 Civ. 11875, 2001 WL 913909 (S.D.N.Y. Aug. 13, 2001)          10

Cross v. NYC Trans. Auth.,
    417 F.3d 241 (2d Cir. 2005)                                     12, 15

DeCintio v. Westchester Cty. Med. Ctr.,
    821 F.2d 111 (2d Cir. 1987)                                     26

Deters v. Equifax Credit Info. Servs., Inc.,
    202 F.3d 1262 (10th Cir. 2000)                                  15

EEOC v. Everdry Mktg. and Mgt., Inc.,
    01 CV 6329, 2005 WL 231056 (W.D.N.Y. Jan. 31, 2005)             18, 19

Faggiano v. Eastman Kodak Co.,
    378 F. Supp. 2d 292, 299 (W.D.N.Y. 2005)                        27, 28

Gallo v. Prudential Residential Servs., LP,
    22 F.3d 1219 (2d Cir. 1994)                         **8**

Heredia v. Small,
    98 Civ. 5351, 2006 WL 47667 (S.D.N.Y. Jan. 9, 2006)       **28**

Johnson-Memoli v. ADT Sec. Servs., Inc.,
    97 Civ. 5397, 1998 WL 352591 (S.D.N.Y. June 26, 1998)     **8**

Knutson v. Brounstein,
    99 Civ. 6094, 2001 WL 1661929 (S.D.N.Y. Dec. 27, 2001)     **9, 10**

Kolstad v. ADA,
    527 U.S. 526 (1999)                        **12, 13, 16**

Lamberson v. Six West Retail Acquisition, Inc.,
    98 Civ. 8053, 2002 WL 59424 (S.D.N.Y. 2002)         **11**

Laurin v. Pokoik,
    02 Civ. 1938, 2004 WL 513999 (S.D.N.Y. March 15, 2004)     **18, 19**

Lee v. Overseas Shipholding Group, Inc.,
    00 Civ. 9682, 2001 WL 849747 (S.D.N.Y. July 30, 2001)     **21**

Lihli Fashions Corp., Inc. v. NLRB,
    80 F.3d 743, 747 (2d Cir. 1996)                  **19**

Luciano v. Olstein Corp.,
    110 F. 3d 210 (2d Cir. 1997)                  **15**

Mandel v. Champion Int'l Corp.,
    361 F. Supp. 2d 320 (S.D.N.Y. 2005)             **27**

Miller v. Beneficial Mgt. Corp.,
    977 F.2d 834, 843 (3d Cir. 1992)                 **21**

Pereira v. Cogan,
    00 Civ. 619, 2002 WL 31496224 (S.D.N.Y. Nov. 8, 2002)     **25**

Robinson v. Time Warner Inc.,
    92 F. Supp. 2d 318, 332 (S.D.N.Y. 2000)           **28**

Tomka v. Seiler Corp.,
    66 F.3d 1295, 1308 (2d Cir. 1995)               **27**

Yoder v. Novo Mediagroup, Inc.,
      00 Civ. 5444 (JSM), 2001 WL 62861 at *4 (S.D.N.Y. January 24, 2001)   18


**STATUTES**

29 U.S.C. § 621(b)          10

Fed. R. Civ. P. 6(e)          23

Fed. R. Civ. P. 8(c)          24

Fed. R. Civ. P. 15(a)          24

Fed. R. Civ. P. 16(b)          25

Investment Advisors Act § 206, 15 U.S.C. §80b-6          2

N.Y. Admin. Code § 8-101          10

N.Y. Admin. Code § 8-107(1)(a)          9

N.Y. Admin. Code § 8-502(a)          9

## PRELIMINARY STATEMENT

Plaintiff Thomas Shuman ("Mr. Shuman") respectfully submits this memorandum of law in opposition to Defendants' Motion for Partial Summary Judgment and Leave to Amend Their Answer. This is a rare and extraordinary case of age discrimination in which there is <u>direct</u> evidence of Defendants' unlawful and willful discriminatory conduct, including the failure to promote Mr. Shuman and the termination of his employment because of his age. Mr. Shuman, a 64-year old former marketer of hedge funds for Defendants, suffered repeated and wide-ranging violations of the employment laws prohibiting age discrimination, harassment and retaliation.

During his employment with Defendants, Mr. Shuman was responsible for marketing Defendants' hedge funds to corporate endowments, foundations and public funds. Prior to Mr. Shuman joining the firm, Defendants did not market its funds to institutional investors and lacked any network or experience in recruiting the type of institutional investors that Mr. Shuman was responsible for introducing to Defendants. Moreover, Defendants managed a relatively new group of hedge funds, without the necessary track record to attract institutional investors. Despite these roadblocks, Mr. Shuman performed his job in an exemplary manner and compiled an outstanding performance record. In fact, he raised more than $200 million for Defendants' hedge funds.

Despite Mr. Shuman's performance, the record in this case is rife with admissions, inconsistencies and documentary and testimonial evidence that clearly demonstrate that Mr. Shuman was denied a promotion to Director of Marketing and eventually terminated because of his age at the behest of Defendants' much younger portfolio managers (many of whom are in their 30s) who generate all of the revenue for the firm and who, as a result, ran the firm's day-to-day business. Moreover, the evidence in this case amply reflects that Defendants

engaged in this unlawful discriminatory conduct with malice.[1]  Although Defendants now seek to

minimize the effect of this evidence, it is clear that Defendants failed to promote Mr. Shuman

and eventually terminated his employment because of his age in willful violation of the laws

prohibiting discrimination, and refused to pay him the commissions that he earned during and

after his employment with Defendants in breach of contract and in retaliation for filing this

lawsuit.

        Defendants' motion for partial summary judgment contends that some of Mr.

Shuman's claims, as well as some corporate Defendants, should be dismissed on the basis that

there are no genuine issues of material fact to be resolved at trial.  However, as set forth below,

Defendants' motion should be dismissed in its entirety.  As an example of the frivolity of

Defendants' motion, Defendants contend that despite their admission that Mr. Shuman was

terminated because of his age, such unlawful conduct cannot subject them to punitive damages,

as a matter of law, because there purportedly are no facts to suggest "that any of Defendants

participated in the decision to terminate Mr. Shuman being cognizant that it would violate

discrimination laws."  This position is disingenuous in light of the fact that the record clearly

demonstrates that the individual Defendants discussed the benefits of putting employment

policies in place to help shield Defendants from liability.  Specifically, the individual Defendants

addressed, on the very same day that they decided to "retire" Mr. Shuman, that "[they] have put

together a human resource policy guide, which we will give to each employee.  This will/should

eliminate some of our liability as we continue to grow."

---

[1]      In light of Defendants' history of maliciously harassing Mr. Shuman, it is not surprising that they make yet another personal attack on Mr. Shuman's character by portraying him as an "imposter," despite the fact that his prior employment history has absolutely no relevance to Defendants' motion for partial summary judgment.  However, to the extent that Defendants rely on a purported misrepresentation on Mr. Shuman's resume as a basis to support his termination, it would be completely undermined by the fact that individual Defendants Carl Tiedemann and Bruce Prolow, both general partners of Tiedemann Investment Group, have repeatedly lied to their investors and the public about their educational backgrounds in Defendants' marketing materials, in violation of U.S. Securities laws.  See Investment Advisors Act § 206, 15 U.S.C. §80b-6; see also Pl. 56.1 Stmt. ¶¶ 59.

As demonstrated further below, this case is replete with material issues of fact that preclude summary judgment on the issues presented in Defendants' motion, and require the denial of Defendants' motion in its entirety.

## STATEMENT OF MATERIAL FACTS

Mr. Shuman was hired by Defendants in 1997 as Senior Vice President, Institutional Marketing to market Defendants' hedge funds to corporate endowments, foundations and public funds. (Pl. 56.1 Stmt. ¶ 1.) During Mr. Shuman's five year employment with Defendants, he raised more than $200 million for Defendants' hedge funds and played an integral role in persuading 25 important institutional accounts to invest with Defendants. (Pl. 56.1 Stmt. ¶¶ 15-20.) Specifically, in 1998 Mr. Shuman was responsible for raising $5,700,000 for Defendants, in 1999 he raised $80,849,680, in 2000 he raised $57,425,000, in 2001 he raised $32,445,048, and in the first three quarters of 2002 (the year in which he was terminated) Mr. Shuman raised $24,413,914 for Defendants. (Id.) In total, Mr. Shuman raised approximately $201,000,000 for Defendants. (Id.)

Despite Mr. Shuman's extraordinary results in 1999 and 2000, he was denied the opportunity to even apply for a promotion to the newly created position of Director of Marketing in October 2000. (Pl. 56.1 Stmt. ¶¶ 28-29.) In fact, Defendants never informed Mr. Shuman of the new Director position, and never posted the position to enable Mr. Shuman to apply. Id. Instead, Mr. Shuman found out after-the-fact, that the newly created position, for which he was eminently qualified, went to Chuck Gulden, who is 20 years younger than Mr. Shuman. Id. Mr. Gulden's compensation package at Defendants was significantly more generous than Mr. Shuman's. (Pl. 56.1 Stmt. ¶ 31.)

3

Throughout his employment with Defendants, Mr. Shuman was subjected to severe and pervasive harassment and ridicule by several young portfolio managers who were also integral members of the corporate Defendants' Executive Committee. (Pl. 56.1 Stmt. ¶¶ 21, 24-26.) These are the same decision makers who did not permit Mr. Shuman to apply for the Director of Marketing position in October 2000, and voted to terminate Mr. Shuman's employment at the Executive Committee meeting on September 30, 2002. (Pl. 56.1 Stmt. ¶¶ 21, 38.) And, at the Executive Committee meeting where it was decided that Mr. Shuman's employment would be terminated, Defendants explicitly discussed "retiring" Mr. Shuman. At the time of his termination, Mr. Shuman was 61 years of age. (Pl. 56.1 Stmt. ¶¶ 32, 40.) Also, at the same Executive Committee meeting a discussion was had about distributing a Company handbook so as to minimize potential liability. (Pl. 56.1 Stmt. ¶ 33.)

On or about October 4, 2002, Defendant Carl Tiedemann met with Mr. Shuman to inform Mr. Shuman that the members of the Executive Committee (many of whom are the Individual Defendants in this action), had decided to terminate his employment. (Pl. 56.1 Stmt. ¶ 39.) At that termination meeting, Carl H. Tiedemann explicitly told Mr. Shuman that he was being terminated because of his age and that he thought "Mr. Shuman's declining performance might be partially attributable to the fact that Mr. Shuman was older than most of the prospective investors he was contacting, and that such disparity may have been a reason for his inability to forge relationships with such investors." (Pl. 56.1 Stmt. ¶¶ 41-42.) Shortly thereafter, Mr. Tiedemann wrote a recommendation letter for Mr. Shuman that states, "[Mr. Shuman] left our firm due to a general restructuring and downsizing in his department, and this was in no way related to his performance." (Pl. 56.1 Stmt. ¶¶ 49.)

4

At the termination meeting, Mr. Tiedemann told Mr. Shuman that Defendants would honor his employment contract and pay his quarterly trailing commissions for as long as the remained at the firm.  (Pl. 56.1 Stmt. ¶ 53.)  In addition, Mr. Tiedemann assured Mr. Shuman that he would receive commissions on all new business from his prospects for a six-month period, and that he would be credited with the First Year Finders Incentive (i.e., 20 basis points) for additional assets invested by Mr. Shuman's existing clients.  (Pl. 56.1 Stmt. ¶ 54.)  In or around December 2002, Mr. Shuman prepared a written agreement – as he had done with three other employment agreements that governed the terms of his commissions during his employment with Defendants – memorializing their agreement.  (Pl. 56.1 Stmt. ¶ 55.)  When Mr. Shuman delivered the written post-termination commission agreement to Laurie Jelenek and Defendant Barbara Warga Naratil, neither Ms. Jelenek nor Ms. Warga expressed any disagreement with its terms.  (Pl. 56.1 Stmt. ¶ 56.)

When Mr. Shuman called Defendant Barbara Warga Naratil (Chief Financial Officer) to complain about Mr. Tiedemann's ageist sentiment, she stated to Mr. Shuman that Mr. Tiedemann "shouldn't have said that."  (Pl. 56.1 Stmt. ¶ 43.)  At Defendant Barbara Warga Naratil's suggestion, however, Messrs. Shuman and Tiedemann had a subsequent meeting over breakfast where Mr. Tiedemann repeated the ageist sentiment among the members of the Executive Committee and stated that "the executive committee wanted to hire a younger salesperson."  (Pl. 56.1 Stmt. ¶¶ 44-45.)  Defendants allege as part of their defense to this litigation, for the first time, that Mr. Tiedemann told Mr. Shuman that his age was the reason for his termination to make him feel better.  (Pl. 56.1 Stmt. ¶ 60.)

However, in a taped telephone conversation subsequent to Mr. Shuman's termination, Mr. Tiedemann does not deny the unlawful ageist sentiment among the Individual

Defendants, and he never stated that he raised Mr. Shuman's age as a basis for his termination to make him feel better, as he now belatedly claims. (Pl. 56.1 Stmt. ¶ 68.) Mr. Tiedemann also stated "we are cranking up on it" in response to Mr. Shuman asking whether Defendants hired any young marketers to replace him. (Pl. 56.1 Stmt. ¶ 66.) Moreover, in response to Mr. Shuman stating that he thought that "the younger money managers wanted to get a young guy to do [the marketing]," Mr. Tiedemann stated "yeah, that's true." (Pl. 56.1 Stmt. ¶ 67.)

Similarly, Carolyn Mills, a disinterested witness who was Defendant Carl H. Tiedemann's personal assistant for five years, frequently heard many of the individual Defendants make fun of Carl H. Tiedemann's age. ((Pl. 56.1 Stmt. ¶ 61.) Moreover, Ms Mills was aware that these same individuals mocked Mr. Shuman's age by stating that he was too old for the job and that a younger marketer was necessary. ((Pl. 56.1 Stmt. ¶ 62.)

In July 2003, Mr. Shuman filed a Charge of Discrimination with the EEOC. (Pl. 56.1 Stmt. ¶ 48.) The EEOC mailed to Mr. Shuman a Notice of Right to Sue on February 4, 2004. (Pl. 56.1 Stmt. ¶ 27.) Mr. Shuman initiated this action by filing the original Complaint on April 29, 2004. Id.

Throughout this litigation, defendants have provided a number of different – and conflicting – explanations for the termination of Mr. Shuman's employment. By way of example, Defendants have alleged that a downturn in their business required them to reorganize the marketing department. (Pl. 56.1 Stmt. ¶ 49.) During the EEOC proceedings, Defendants claimed it was Mr. Shuman's concocted drinking problem and his performance during the last two years of his employment at Defendants. (Pl. 56.1 Stmt. ¶ 50.) Then, Defendants attempted to justify the unlawful termination of Mr. Shuman's employment on the grounds that Mr. Shuman lacked productivity in the last two years of his employment and was unable to prevent

6

redemptions or withdrawals of funds by investors that he introduced to Defendants.  (Pl. 56.1 Stmt. ¶ 51.)  Finally, Defendants alleged that it was Mr. Shuman's "five years of bad performance" and his work experience prior to joining corporate Defendants.  (Pl. 56.1 Stmt. ¶ 52.)  This final purported basis for justifying the termination of Mr. Shuman is belied by the fact that in 2001 – the only full year in which Messrs. Shuman and Gulden competed head-to-head – Mr. Shuman raised approximately $32 million for Defendants' hedge funds, while Gulden only raised approximately $17 million.  (Pl. 56.1 Stmt. ¶ 63.)  In addition, in 2003 (the year after Mr. Shuman was terminated), Gulden raised only $3 million net of redemptions.  (Pl. 56.1 Stmt. ¶ 64.)  However, despite Mr. Gulden's underperformance, he was retained as Director of Marketing and continues to be an active employee at Defendants.  (Pl. 56.1 Stmt. ¶ 65.)

## ARGUMENT

### I.   DEFENDANTS HAVE FAILED TO MEET THE STANDARDS FOR SUMMARY JUDGMENT AND THEIR MOTION SHOULD BE DENIED

Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of making this showing, and the district court must view all facts in the light most favorable to the non-moving party, as well as resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Gallo v. Prudential Residential Servs., LP, 22 F.3d 1219, 1223 (2d Cir. 1994).

"[I]n determining whether to grant summary judgment, this Court must (1) determine whether a genuine factual dispute exists based on the evidence in the record, and (2) determine, based on the substantive law at issue, whether the fact in dispute is material." Johnson-Memoli v. ADT Sec. Servs., Inc., 1998 WL 352591 at *2 (S.D.N.Y. June 26, 1998). Here, the record shows both that genuine factual disputes exist and that the disputed facts are material to Mr. Shuman's claims, thus precluding summary judgment in its entirety.

### II.   PUNITIVE DAMAGES ARE AVAILABLE TO PLAINTIFF UNDER THE NYCHRL FOR DEFENDANTS' INTENTIONAL, WILLFUL AND MALICIOUS HARASSMENT, DISCRIMINATION AND RETALIATION

In the Second Amended Complaint, Mr. Shuman properly seeks an award of punitive damages under the Fifth, Sixth, Seventh and Eighth causes of action for Defendants' malicious, willful and wanton violations of the New York City Human Rights Law

("NYCHRL").[2]  See Compl. ¶¶ 86-100.  As set forth below, because Defendants engaged in unlawful discriminatory and retaliatory conduct with malice and/or reckless indifference to Mr. Shuman's statutorily protected rights, punitive damages are available to Mr. Shuman under the NYCHRL.

### A.  The NYCHRL Provides For An Award Of Punitive Damages For Claims Of Age Discrimination.

Although Defendants make a futile attempt to argue that punitive damages are not available for claims of age discrimination under the NYCHRL, that position simply is false.  The NYCHRL prohibits an employer from discriminating against an employee in compensation, terms, conditions or privileges of employment, or to discharge such person from employment, because of that person's actual or perceived age.  N.Y. Admin. Code § 8-107(1)(a).  And, it is well-settled that the NYCHRL allows prevailing plaintiffs to obtain uncapped punitive damages from private employers that "engage in a discriminatory practice or practices with malice or reckless indifference to Plaintiff's protected rights."  Knutson v. Brounstein, 99 Civ. 6094, 2001 WL 1661929, at *6 (S.D.N.Y. Dec. 27, 2001); see also N.Y. Admin. Code § 8-502(a).

Despite Defendants' argument to the contrary, it is well-settled that punitive damages are available to prevailing plaintiffs in claims of unlawful age discrimination under the NYCHRL.  First, nothing in the NYCHRL indicates that punitive damages are unavailable in claims of age discrimination.  Second, just about every Court in this District to address this issue has held that a prevailing plaintiff in a claim of age discrimination may recover punitive damages under the NYCHRL.  See, e.g., Chapkines v. NYU, 02 Civ. 6355, 2004 U.S. Dist. LEXIS 2990,

---

[2]  Defendants' brief mistakenly claims that Plaintiff requests an award of punitive damages without specifying the causes of action for which he seeks such damages.  See Defs. Br. at 19.  A review of the Second Amended Complaint makes absolutely clear that Plaintiff seeks punitive damages only for Defendants' multiple violations of the NYCHRL.  Compl. ¶¶ 72-100.  Plaintiff agrees with Defendants (and has never contended otherwise) that punitive damages are not available under the ADEA (which provides for liquidated damages) or the NYSHRL.

at *18 (S.D.N.Y. Feb. 25, 2004) (stating that "a prevailing plaintiff may recover punitive damages in a claim of [age] discrimination under the NYCHRL."); Knutson v. Brounstein, 2001 WL 1661929, at *6 (punitive damages are available remedy under NYCHRL in age discrimination claims); Collings v. Indus. Acoustics Co., 99 Civ. 11875, 2001 WL 913909, at *5 (S.D.N.Y. Aug. 13, 2001) (same).

The only case cited by Defendants to the contrary is Chambers v. Capital Cities, 851 F. Supp. 543 (S.D.N.Y. 1994). However, Defendants' reliance on Chambers is misplaced. Not only is Chambers a much older case than the several cases holding to the contrary cited above, but the reasoning in Chambers (i.e., that such awards under the NYCHRL would frustrate consensual resolution of issues or informal settlement efforts of claims of age discrimination) simply does not make sense.

The goals of the ADEA (as well as all other anti-discrimination statutes) are remedial. Specifically, the ADEA provides that "the purpose of this chapter [is] to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b).[3]  It is nonsensical that the prohibition on punitive damages would somehow thwart these remedial goals.  In fact, the opposite is true.  Punitive damages are intended to punish a wrongdoer for wanton misconduct, as well as to deter others from intentionally engaging in the same discriminatory misconduct.  Allowing employers to avoid punitive damages for their willful and wanton discriminatory misconduct would thwart the deterrent effect of the NYCHRL, and have a deleterious effect on the remedial purposes of the laws prohibiting age discrimination.

---

[3]     Similarly, the NYCHRL was enacted specifically "to eliminate and prevent discrimination from playing any role in actions relating to employment . . . [and prevent] prejudice, intolerance, bigotry and discrimination." N.Y. Admin. Code § 8-101.

In addition, although informal resolution of claims of discrimination is favored, there is no support for Defendants' (or the Chambers Court's) proposition that the presence of punitive damages under the NYCHRL would somehow "obliterate resort to mediation" or create incentive "for pursuing lawsuits to the bitter end." See Defs. Br. at 20; Chambers v. Capital Cities, 851 F. Supp. at 546.  To the contrary, the possible award of exemplary damages creates an incentive for the alleged wrongdoer to resolve claims of discrimination short of trial (rather than deter a plaintiff from settling), just as the availability of liquidated damages of twice the economic damages can provide motivation to settle claims under the ADEA.  Defendants' reliance on Chambers cannot be reconciled with the fact that the ADEA provides for such liquidated damages, which, under the reasoning in Chambers, would curtail a plaintiff's motivation for settling his or her claims.  Moreover, stripping the NYCHRL of its provision for exemplary damages provides an inventive for a deep-pocket defendant in an employment discrimination action to pursue litigation to the bitter end, knowing that the plaintiff (who usually has been displaced from his or her job) likely cannot withstand the expense of litigation for the same period as a corporation.

Finally, as recognized by the Court in Chambers, Title VII, which provides for punitive damages, has the same remedial goals as the ADEA.  851 F. Supp. at 546.  If the Court's reasoning in Chambers held true, Title VII would never have been amended to provide for punitive damages.  Moreover, there is no dispute that parallel claims to Title VII under the NYCHRL provide for uncapped punitive damages and surely, the Court's rationale in justifying its decision in Chambers would be applicable where the federal statute has caps on punitive damages and the City law does not.  See, e.g., Lamberson v. Six West Retail Acquisition, Inc., 98 Civ. 8053, 2002 WL 59424, at *5, n.4 (S.D.N.Y. 2002).  In fact, no court has held that

11

uncapped punitive damages for such claims of discrimination somehow would "obliterate" informal settlement efforts in such cases.

In light of the fact that the overwhelming case authority in this District provides that punitive damages are available to prevailing plaintiffs in claims of age discrimination under the NYCHRL, the Court should reject Defendants' motion to strike Mr. Shuman's request for punitive damages.

**B.      Plaintiff Is Entitled To An Award Of Punitive Damages Because Defendants' Intentional Violations Of The NYCHRL Were Willful, Wanton And In Reckless Disregard Of Plaintiff's Statutorily Protected Rights.**

A prevailing plaintiff is entitled to an award of punitive damages where "the employer has engaged in intentional discrimination and has done so with malice or with reckless indifference to the . . . protected rights of an aggrieved individual." Kolstad v. ADA, 527 U.S. 526, 534 (1999) (citing 42 U.S.C. 1981(b)(1)). This is the same standard utilized for punitive damages in claims of age discrimination under the NYCHRL. See Chapkines v. NYU, 2004 U.S. Dist. LEXIS 2990, at *18.

Punitive damages are designed to punish especially egregious acts or violations of law and deter or discourage wrongdoers from engaging in similar misconduct in the future. It is well-settled that the "willfulness" required to support claims for or punitive damages "can be established either by proof that a defendant actually knew that his conduct violated [antidiscrimination] law or by reckless disregard for [the laws prohibiting age discrimination]." Cross v. NYC Trans. Auth., 417 F.3d 241, 252-53 (2d Cir. 2005) (emphasis in original); see also Kolstad v. ADA, 527 U.S. at 534 (1999). Moreover, "egregious or outrageous acts may serve as evidence supporting an inference of the requisite 'evil motive'." Kolstad v ADA, 527 U.S. at 538. Accordingly, Defendants' motion to strike Mr. Shuman's claims for punitive damages must

12

be denied if Mr. Shuman can demonstrate that genuine material factual disputes exist with respect to whether Defendants (i) committed egregious or outrageous acts, (ii) acted with malice, or (iii) acted with reckless indifference to Mr. Shuman's statutorily protected rights.  As set forth below, Mr. Shuman easily can meet this burden, thus precluding summary judgment.

### 1.    Defendants Acted With Malice.

The record in this case is fraught with evidence that Defendants acted with malice in the discriminatory harassment, failure to promote and termination of Mr. Shuman.

By way of example only, Defendant Carl H. Tiedemann, Chairman and CEO of Tiedemann Investment Group, explicitly told Mr. Shuman on or about October 4, 2002, at the termination meeting that Mr. Shuman was being terminated because of his age.  (Pl. 56.1 Stmt. ¶ 41).  Specifically, Mr. Tiedemann stated that he thought "[Mr. Shuman's] declining performance might be partially attributable to the fact that [Mr. Shuman] was older than most of the prospective investors he was contacting, and that such disparity may have been a reason for his inability to forge relationships with such investors."  (Pl. 56.1 Stmt. ¶ 42).  Within days of the termination meeting, Mr. Tiedemann at a breakfast meeting again told Mr. Shuman that he was terminated because of his age and that "it's just much better for Tiedemann Investment Group to have a younger marketing person."  (Pl. 56.1 Stmt. ¶ 47).  This direct evidence of discriminatory intent, standing alone, clearly raises an issue of material fact regarding Defendants' evil motives in terminating Mr. Shuman's employment.

Although Defendants now seek to minimize the effect of this admission by asserting that Mr. Tiedemann told Mr. Shuman that he was being terminated because of his age as "an effort to let him down easy," this post hoc explanation for Mr. Tiedemann's admission is patently absurd and is contradicted by the record.  For example, such explanation was neither

told to Mr. Shuman during a subsequent audio taped telephone conversation with Mr. Tiedemann (in which Mr. Tiedemann acknowledges that other decision makers wanted to terminate Mr. Shuman because of his age and replace him with a younger marketer) nor included in Defendants' position statement to the EEOC.  (Pl. 56.1 Stmt. ¶ 46).  Rather, this newly created, unconvincing and eleventh hour explanation was transparently invented by Defendants' counsel to cover-up Mr. Tiedemann's discriminatory admission.

The record also demonstrates that several of the Individual Defendants, who were both the decision makers in this case and senior executives at corporate Defendants, made discriminatory comments throughout Mr. Shuman's employment towards him and Carl H. Tiedemann based on their age.  By way of example only (and the record reveals several more):

- The younger managers at Tiedemann stated that they wanted to have a younger marketing man.  (Pl. 56.1 Stmt. ¶ 22)

- Defendant Michael Tiedemann stated that he will feel a lot more comfortable with a younger marketing manager.  (Pl. 56.1 Stmt. ¶ 23)

- Defendants Steve Diamond and Dominic Moross constantly mocked Mr. Shuman because of his age.  (Pl. 56.1 Stmt. ¶ 24)

- After a business trip, Defendant Dominic Moross told Mr. Shuman that "You're just too old, you just don't understand my . . . this is state of the art, this is state of the art money management" and "you and Carl are out of touch.  You . . . cannot appreciate what I'm doing here, you're just too out of it, you're too old."  (Pl. 56.1 Stmt. ¶ 25)

- After another business meeting, Defendant Dominic Moross stated to Mr. Shuman, "See, I told you that any young person would appreciate my strategy…you just don't get it," and that Mr. Shuman was "too old-fashioned, too far behind the times in terms of modern product." (Pl. 56.1 Stmt. ¶ 26)

- Chuck Gulden, the much younger marketer who was hired over Mr. Shuman to the newly created position of Director of Marketing, repeatedly mocked Messrs. Shuman and Tiedemann as being out of date because of their ages, and even stated to Mr. Shuman that he "would never bring any prospects or clients into Carl Tiedemann's office [because] we would lose the business immediately." (Pl. 56.1 Stmt. ¶ 27)

14

These patently discriminatory comments, made by the same people who failed to promote and admittedly terminated Mr. Shuman's employment because of his age, provide further evidence of Defendants' willful discriminatory conduct.  <u>See</u>, <u>e.g.</u>, <u>Deters v. Equifax Credit Info. Servs., Inc.</u>, 202 F.3d 1262, 1269 (10th Cir. 2000) (evidence of lewd jokes and comments sufficient for jury to reasonably conclude defendant acted with malice or reckless indifference with respect to punitive damages); <u>Luciano v. Olstein Corp.</u>, 110 F. 3d 210, 221 (2d Cir. 1997) (evidence that defendant's human resources director called plaintiff "bitch" supports finding of malice or reckless indifference).

Moreover, in a taped telephone conversation subsequent to Mr. Shuman's termination, Mr. Tiedemann stated "we are cranking up on it" in response to Mr. Shuman asking whether Defendants hired any young marketers to replace him. (Pl. 56.1 Stmt. ¶ 66).  And, in response to Mr. Shuman stating that he thought that "the younger money managers wanted to get a young guy to do [the marketing]," Mr. Tiedemann stated "yeah, that's true." (Pl. 56.1 Stmt. ¶ 67).  Nowhere in the taped conversation did Mr. Tiedemann deny the egregious ageist sentiment among the Individual Defendants, and he never stated that he raised Mr. Shuman's age as a basis for his termination to make him feel better, as he now belatedly claims. (Pl. 56.1 Stmt. ¶ 68).  In light of the overwhelming record evidence demonstrating that Defendants engaged in intentional discrimination with malice, the Court should deny Defendants' motion to strike Mr. Shuman's claims for punitive damages.

**2.     Defendants Acted In Reckless Indifference To Plaintiff's Statutorily Protected Rights.**

As set forth above, a prevailing plaintiff also is entitled to an award of punitive damages where his or her employer "acted with reckless indifference to the . . . [statutorily] protected rights of an aggrieved individual." <u>Kolstad v. ADA</u>, 527 U.S. at 534; <u>see</u> <u>also</u> <u>Cross v.</u>

NYC Trans. Auth., 417 F.3d at 252-53.  A plaintiff can satisfy this burden by demonstrating that

the employer knew that its conduct may be in violation of law.  Kolstad v. ADA, 527 U.S. at

536.  Although Defendants now claim that the record does not support a finding that Defendants

were aware that their admittedly intentional misconduct violated the laws against discrimination,

such conclusion is disingenuous and directly contradicted by the record.

By way of example only, the record clearly demonstrates that the individual

Defendants discussed implementing a "human resource policy guide . . . [to] eliminate some of

our liability as we continue to grow" at the same executive committee meeting where they voted

to terminate Mr. Shuman's employment because of his age.  (Pl. 56.1 Stmt. ¶ 33).  Defendants

began working on the human resources policy guide as early as 2001, nearly two years before

Mr. Shuman's employment was terminated.  (Pl. 56.1 Stmt. ¶ 34).  To now claim that the

members of Defendants' executive committee (most of whom are individual Defendants) were

not cognizant that their misconduct may be in violation of the laws prohibiting age

discrimination when they sat through discussion of the benefits of having employment policies in

place on the same day that they voted to terminate Mr. Shuman's employment because of his age

is dishonest and should be rejected.

In addition, despite conclusive evidence that the firm did not have a handbook or

a written policy prohibiting discrimination, various individual Defendants testified that they

knew about the discrimination laws and even testified that there were policies and a handbook –

a complete fabrication.  For example, Carl Tiedemann testified that Defendants maintained an

employee handbook for "ten years" that has been "sent out to everyone" and included a

provision stating that discrimination and harassment are "forbidden.  I mean, it's forbidden to

discriminate on the whole categories, including age."  (Pl. 56.1 Stmt. ¶ 37).  Furthermore,

16

Defendant Michael Tiedemann, President of Tiedemann Investment Group, testified that the reasons Defendants created a human resources policy guide in 2002 (prior to Mr. Shuman's termination) was "to create policies to make sure they are very clear and, in whole, the employees are accountable," and to "absolutely" reduce or eliminate liability. (Pl. 56.1 Stmt. ¶ 35). Finally, Laurie Jelenek, general partner at corporate Defendants, testified that during Mr. Shuman's employment, Defendants maintained a policy against discrimination and posted the New York Labor Law posters in their office, which contained general anti-discrimination policies. (Pl. 56.1 Stmt. ¶ 36)  Based on these foregoing, there are clear issues of material fact regarding Defendants' reckless indifference to Mr. Shuman's statutorily protected rights, thus precluding summary judgment.

Not only does the record demonstrate that Defendants were aware of the anti-discrimination laws, but Defendants are a sophisticated organization run by savvy and experienced businesspeople, with a human resources department. (Pl. 56.1 Stmt. ¶ 2-4). Moreover, a jury can infer willfulness from Defendants' subsequent false and shifting justifications for their failure to promote Mr. Shuman and the ultimate termination of his employment as a calculated effort to conceal the real discriminatory reason for such adverse employment actions. See, e.g., Benjamin v. United Merchants and Mfrs., Inc., 873 F.2d 41, 44-45 (2d Cir. 1989) (affirming finding of willful age discrimination where defendant proffered differing rationales when explaining reason for plaintiff's termination of employment). Each of these facts, standing alone, is sufficient to raise a triable issue of material fact regarding Defendants' willfulness and/or reckless disregard for the laws prohibiting age discrimination. Accordingly, Defendants' motion to strike Mr. Shuman's claims for punitive damages should be denied.

17

### III.   MATERIAL ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT WITH RESPECT TO TIEDEMANN INVESTMENT GROUP (THE UMBRELLA ENTITY), TIEDEMANN INVESTMENT GROUP, INC. AND TIEDEMANN TRUST COMPANY

Defendants argue that Defendant Tiedemann Trust Company should be dismissed because it was not Mr. Shuman's employer, and that Defendants Tiedemann Investment Group (the umbrella entity) and Tiedemann Investment Group, Inc. cannot be sued because they are not legal entities capable of being sued. These purported bases for summary judgment are contradicted by the record and should be denied.

### A.   Tiedemann Investment Group and Tiedemann Trust Company Constitute A Single Employer.

Defendants mistakenly allege that Tiedemann Trust Company should be dismissed because it was not Mr. Shuman's employer. This argument is without merit in light of the fact that genuine issues of material fact exist precluding summary judgment as to whether Tiedemann Trust Company and Tiedemann Investment Group are jointly liable for Defendants' intentional harassment, discrimination and retaliation against Mr. Shuman as "single employers." See, EEOC v. Everdry Mktg. and Mgt., Inc., 01 CV 6329, 2005 WL 231056, at *5 (W.D.N.Y. Jan. 31, 2005) (genuine issues of material fact exist which preclude summary judgment on whether entities were liable as single employers); Laurin v. Pokoik, 02 Civ. 1938 (LMM), 2004 WL 513999, at *8-9 (S.D.N.Y. March 15, 2004) (same).

A single employer relationship exists where two ostensibly separate entities are actually a single integrated enterprise so that, for all purposes, there is in fact only a single employer. See, Yoder v. Novo Mediagroup, Inc., 00 Civ. 5444 (JSM), 2001 WL 62861 at *4 (S.D.N.Y. January 24, 2001) ("single employer doctrine allows two entities to be regarded as a single employer if they have interrelated operations, common management, centralized control

of labor relations, and common ownership."). And, where a single employer relationship exists, all purportedly separate entities are jointly liable. Laurin v. Pokoik, 2004 WL 513999 at *5.

Courts utilize the following four factors to determine whether two allegedly separate employers constitute a "single employer": (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; (4) common ownership or financial control. EEOC v. Everdry Mktg. and Mgt., Inc., 2005 WL 231056, at *5 (citation omitted). It is clear that not every factor need be present, nor is any particular factor controlling in the determination of single employer status. Lihli Fashions Corp., Inc. v. NLRB, 80 F.3d 743, 747 (2d Cir. 1996). However, the most important factor is the centralized control over labor relations. See, e.g., Laurin v. Pokoik, 2004 WL 513999, at *4.

As described above, genuine issues of material fact arise under these factors and summary judgment must therefore be denied. First, it is undisputed that there is (and at all relevant times has been) an interrelationship of operations between Tiedemann Trust Company and Tiedemann Investment Group. By way of example only, (a) the two entities had "formal official shared [board] meetings which happened two times a year. . . . in front of the supervisory board." (Pl. 56.1 Stmt. ¶ 5); (b) they shared employees (Pl. 56.1 Stmt. ¶ 8); and (c) Tiedemann Trust Company's marketing materials state that "The efforts of Tiedemann Trust Company are firmly supported by the financial strength and resources of [Tiedemann Investment Group]. . . . [T]he management of Tiedemann Trust Company has complete access to the portfolio managers and strategies at [Tiedemann Investment Group] for valuable market and individual manager . . . data." (Pl. 56.1 Stmt. ¶ 10). Tiedemann Trust Company does not pay a fee to utilize the expertise and resources of Tiedemann Investment Group. (Pl. 56.1 Stmt. ¶ 11) These undisputed facts place in doubt Defendants' claims that Defendant Tiedemann Trust Company

19

has its own board of directs and governance procedures separate and apart from Tiedemann Investment Group.

Similarly, there was a clear centralized control over labor relations between Tiedemann Trust Company and Tiedemann Investment Group.  By way of example only, (i) both companies shared a human resources department (Pl. 56.1 Stmt. ¶ 2); (ii) a single employee of Tiedemann Investment Group, Kelly Ryan, was responsible for managing all of the human resources functions for both entities.  (Pl. 56.1 Stmt. ¶ 3); (iii) a single person, Defendant Barbara Warga Naratil, supervised the human resources functions for both entities; and (iv) Ms. Warga and/or Laurie Jelenek did the payroll for both entities (Pl. 56.1 Stmt. ¶ 4).  Moreover, although Defendants now claim, for the first time, that Craig Smith, President of Tiedemann Trust Company, is the ultimate decision maker with respect to employment-related matters for Tiedemann Trust Company without involvement of Tiedemann Investment Group, the record demonstrates that Defendant Bruce Prolow, who was a general partner of Tiedemann Investment Group, was the individual who reported during the joint board of directors meetings with respect to the anticipated staffing needs of Tiedemann Trust Company, while Mr. Smith reported on issues related to employee benefits.  (Pl. 56.1 Stmt. ¶ 7).  Accordingly, there are numerous material issues of fact with respect to the control over labor relations.

As to the third and fourth factors, the record makes it readily apparent that there is common management and ownership between the two entities.  In addition to the joint board of directors meetings, there are several senior executives who hold executive-level positions at both companies (Pl. 56.1 Stmt. ¶ 9), and Tiedemann Investment Group owns the controlling shares of Tiedemann Trust Company.  (Pl. 56.1 Stmt. ¶ 13).  Accordingly, genuine issues of material fact

exist which preclude summary judgment on whether Tiedemann Trust Company and Tiedemann Investment Group are liable as single employers.

**B.    Material Issues Of Fact Preclude A Finding That Tiedemann Investment Group (The Umbrella Entity) And Tiedemann Investment Group, Inc. Are Legally Capable Of Being Sued.**

Although Defendants now claim that Tiedemann Investment Group (the umbrella entity) and Tiedemann Investment Group, Inc. are not legal entities capable of being sued, Defendants' own submission to the EEOC indicates that the opposite may be true. (Pl. 56.1 Stmt. ¶ 2). Not only did Defendants' counsel, who has represented Defendants for many years, defend the EEOC proceedings on behalf of the umbrella entity, it also described Tiedemann Investment Group, Inc. as an umbrella entity. (Id.) Because issues of material fact exist with respect to the legal status of these entities, summary judgment should be denied.

**IV.    PLAINTIFF'S FAILURE TO PROMOTE CLAIMS WERE TIMELY FILED UNDER THE NYSHRL AND NYCHRL**

Defendants assert that Mr. Shuman's claims regarding Defendants' discriminatory failure to promote him to Director of Marketing are time barred. Although that defense may apply to Mr. Shuman's non-promotion claims under the ADEA (which has a 300-day limitations period), such claims are timely under NYSHRL and NYCHRL. It is well-settled that the NYSHRL and NYCHRL are both governed by a three-year statute of limitations, and that "the statute of limitations is tolled during the period in which a complaint is filed with . . . the EEOC." See, e.g., Lee v. Overseas Shipholding Group, Inc., 00 Civ. 9682, 2001 WL 849747, at *8 (S.D.N.Y. July 30, 2001). And, the statute of limitations begins to accrue for a claim of discriminatory failure to promote when the plaintiff knows or has reason to know of the discriminatory injury. See, e.g., Miller v. Beneficial Mgt. Corp., 977 F.2d 834, 843 (3d Cir. 1992) (denying motion for summary judgment on timeliness grounds because limitations period

began to run on failure to promote claim when plaintiff "knew or should have known" about failure to promote)  Accordingly, in order for Mr. Shuman's claims of discriminatory failure to promote to be timely under the NYSHRL and NYCHRL, he must have filed his charge of discrimination with the EEOC within three years of his knowledge that Chuck Gulden had been hired for the new Director position.

As acknowledged by Defendants, Mr. Shuman filed his charge of discrimination with the EEOC on July 24, 2003.  See Defs. Br. at 12.  Thus, Mr. Shuman's claims for Defendants' failure to promote him to the newly created Director of Marketing position are timely if he first knew (or should have known) that Chuck Gulden was hired for the Director position on or after July 25, 2000.  As set forth above, Defendants never informed Mr. Shuman of the new Director position, and never posted the position to enable Mr. Shuman to apply.  (Pl. 56.1 Stmt. ¶ 29)  Instead, Mr. Shuman found out after-the-fact, that the newly created position, for which he was eminently qualified, went to Chuck Gulden, a much younger candidate who is 20 years younger than Mr. Shuman.  (Pl. 56.1 Stmt. ¶ 28)  In fact, Mr. Shuman does not recall being alerted to the hiring of Mr. Gulden for the Director position until sometime in late October 2000, and Defendants' position statement to the EEOC demonstrates that "[a]fter Mr. Gulden was hired as Managing Director of Marketing, it was made clear to Mr. Shuman by Tiedemann's senior partners that he was to report to Mr. Gulden."[4]  (Pl. 56.1 Stmt. ¶ 28; Pl. 56.1 Stmt. ¶ 30 (emphasis added)).  Accordingly, Mr. Shuman's claims for non-promotion are timely under the NYSHRL and NYCHRL.

---

[4]      Defendants allege that Mr. Gulden was hired on September 28, 2000.  Although the date of hire does not trigger the accrual of the statute of limitations, even accepting such date of hire requires a finding that Mr. Shuman's claims for failure to promote were timely filed.

Even if the Court were to hold that the statute of limitations tolled only during the pendency of the EEOC investigation (and not during the period between Mr. Shuman's receipt of his right to sue letter from the EEOC and the date he filed the Complaint), Mr. Shuman's non-promotion claims are still timely. As set forth above, Mr. Shuman filed his charge with the EEOC on July 24, 2003, and received his right to sue letter from the EEOC on February 7, 2003.[5] ((Pl. 56.1 Stmt. ¶ 27) Subsequently, Mr. Shuman initiated this action on April 29, 2004. Based on these facts, and assuming that the statute of limitations tolled only during the EEOC's investigation, Mr. Shuman's claims are timely under the NYSHRL and NYCHRL provided he learned of the discriminatory failure to promote him to the newly created Director position on or after October 13, 2000. As set forth above, Mr. Shuman did not learn that Mr. Gulden was hired for the new Director of Marketing position until late October 2000, which is within the three-year limitation period under the NYSHRL and NYCHRL.

## V.   PLAINTIFF'S CLAIMS FOR UNPAID COMMISSIONS AND RETALIATION ARE NOT BARRED AS A MATTER OF LAW

Defendants seek summary judgment on Mr. Shuman's claims for unpaid commissions and unlawful retaliation with respect to Defendants' decision to withhold such commissions on the ground that Mr. Shuman's written post-termination commission agreement is unenforceable under the Statute of Frauds. As set forth below, Defendants' request for summary judgment should be denied because Defendants failed to timely assert such affirmative defense in the Answer (and fail to provide any explanation for their undue delay in seeking leave to amend), and because the enforceability of Mr. Shuman's post-termination commission agreement is not relevant to his retaliation claims.

---

[5]     Although the right to sue letter is dated February 4, 2003, it is presumed that Mr. Shuman received it on February 7, three days after it was mailed by the EEOC. Fed. R. Civ. P. 6(e); see also Baldwin County Welcome Ctr., 466 U.S. 147, 148 n.1 (1984) (applying three day presumption of receipt to Notice of Right to Sue).

**A.** **Defendants Waived Their Affirmative Defense of Statute of Frauds.**

Defendants attempt to rely on the Statute of Frauds to escape liability for its

failure to pay Mr. Shuman the commissions that he earned under the parties' post-termination

compensation agreement. This defense, however, is inapplicable because Defendants have failed

to plead the Statute of Frauds as an affirmative defense in their answer to the Second Amended

Complaint. See AM Cosmetics Inc. v. Solomon, 67 F. Supp. 2d 312, 319 (S.D.N.Y. 1999)

(rejecting motion for summary judgment to breach of contract on Statute of Frauds grounds

where defense not plead in answer). Rule 8(c) of the Federal Rules of Civil Procedure mandates

that "[i]n a pleading to a preceding pleading, a party shall set forth affirmatively . . . statute of

frauds . . . and any other matter constituting an avoidance or affirmative defense." Fed. R. Civ.

P. 8(c). The failure to plead the statute of frauds as an affirmative defense in a party's answer

results in the waiver of that defense. AM Cosmetics Inc. v. Solomon, 67 F. Supp. 2d at 619.

Because Defendants have failed to plead in their Answer to the Second Amended Complaint the

statute of frauds as an affirmative defense (which was raised for the first time at the eleventh

hour in connection with this motion for summary judgment), it has been waived and is not

available to them.

**B.** **Defendants' Request To Amend Answer To Include Statute Of Frauds As Affirmative Defense Should Be Denied Because Defendants Have Not Demonstrated "Good Cause" For Their Failure To Plead Such Defense In Their Answer.**

At this late stage of the litigation, Defendants seek leave to amend their Answer to

the Second Amended Complaint to add an affirmative defense that the Statute of Frauds bars Mr.

Shuman's claims for breach of contract. In support of their request for leave, Defendants

mistakenly rely on the purportedly lenient "freely given when justice when justice so requires"

standard under Fed. R. Civ. P. 15(a) for granting leave to amend to pleadings. Defs. Br. at 24.

However, where leave to amend a pleading is requested after the court-ordered deadline for the completion of discovery, and in particular, as here, on the proverbial eve of trial, the "good cause" standard of Fed. R. Civ. P. 16(b) must apply. See Pereira v. Cogan, 00 Civ. 619, 2002 WL 31496224, at *3 (S.D.N.Y. Nov. 8, 2002) (stating that party seeking leave to amend answer has "'burden of showing a compelling reason for the delay' in seeking to amend his answer until the eve of trial") (citation omitted); Classicbury Ltd. v. Musicmaker.com, Inc., 01 Civ. 1756, 2001 WL 1658241 (S.D.N.Y. Dec. 26, 2001), aff'd, 48 Fed. Appx. 360 (2d Cir. 2002) (affirming denial of leave to amend answer where defendant failed to show "good cause" for failure to plead before discovery cut-off date).

Not only do Defendants utterly fail to meet the "good cause" standard required to amend a pleading under Rule 16(b), but they do not even attempt to provide any explanation for their failure to plead the Statute of Frauds as an affirmative defense in their Answer to the Second Amended Complaint, which was filed on September 9, 2005. Moreover, Defendants fail to provide any justification for their undue delay of nearly six months from the date that the defense properly should have been asserted to seek leave to amend the Answer. Rather, in a futile effort to resurrect an affirmative defense that has been waived, Defendants claim that Mr. Shuman would not be prejudiced by the eleventh hour amendment because the issue of Mr. Shuman's commissions purportedly was "the subject of extensive discovery in this case, and witnesses were specifically questioned about the December 31, 2002 Memo." Defs. Br. at 24-25. However, that simply is not true.

A review of the deposition testimony relied on by Defendants reveals that no testimony was taken with respect to Defendants' belief that Mr. Shuman's written post-termination compensation agreement was unenforceable under the Statute of Frauds. To the

contrary, the record reflects that Mr. Shuman did not seek (nor did he have any reason to request) discovery regarding other certifications or written documents, including emails, confirming the terms of the post-termination commission agreement, which would summarily defeat Defendants' reliance on the Statute of Frauds. However, without this additional discovery, Mr. Shuman will be severely prejudiced in his ability to address Defendants' late claim that his post-termination compensation agreement, which was submitted to Defendants in writing without objection (see Pl. 56.1 Stmt. ¶ 56), is unenforceable under the Statute of Frauds. In light of the prejudice that Mr. Shuman would suffer if Defendants' amended the Answer at this late stage of the litigation to assert a new affirmative defense, and because Defendants failed to provide any explanation for its undue delay of nearly six months to assert this affirmative defense, Defendants' eleventh hour request for leave to amend the Answer should be denied.[6]

### C.   Questions of Material Fact Preclude Summary Judgment With Respect to Plaintiff's Claims Of Unlawful Retaliation.

Defendants also rely on their untenable position that Mr. Shuman had no legally enforceable right to the commissions that Defendants withheld after Mr. Shuman filed the Complaint in this action on April 29, 2004 in an effort to dismiss Mr. Shuman's claims for unlawful retaliation. As set forth below, however, the issue of whether Mr. Shuman had a legal entitlement to the unpaid commissions is irrelevant to his claims of retaliation. Rather, the record evidence demonstrating that retaliatory animus played a role in Defendants' decision to withhold the commissions from Mr. Shuman is sufficient to defeat summary judgment, even if Defendants can identify objectively valid grounds for such decision. DeCintio v. Westchester

---

[6]      In the unlikely event that the Court grants Defendants' request for leave to amend the Answer, we respectfully request that the Court grant Mr. Shuman additional discovery at Defendants' cost, limited to the issues presented by the additional affirmative defense. See, e.g., Classicbury Ltd. v. Musicmaker.com, Inc., 2001 WL 1658241, at *3 (offering defendant conditional permission to amend answer post-discovery on grounds that defendant pay for expenses incurred by plaintiff for discovery on amendment), aff'd, 48 Fed. Appx. 360.

Cty. Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987) (reversing grant of summary judgment where evidence existed of retaliatory animus).

To state a claim for unlawful retaliation, a plaintiff must demonstrate that (1) he or she was engaged in a protected activity; (2) the employer was aware of the activity; (3) the employer took adverse employment action against him or her; and (4) a causal connection existed between the alleged adverse action and the protected activity. See, e.g., Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995). Here, Defendants concede that Mr. Shuman can satisfy the first two elements. See Defs. Br. at 17. However, Defendants allege that Mr. Shuman cannot satisfy the third or fourth elements.

Defendants assert that their decision to withhold commissions from Mr. Shuman cannot, as a matter of law, constitute an adverse employment action because Mr. Shuman had no legal entitlement to such commissions. This assertion completely misses the fundamental concept of an "adverse employment action" and would preclude a finding of an adverse employment action in every case where the plaintiff could not demonstrate a legal entitlement to the detrimental change in the term or condition of his or her employment. Such result would be absurd. Rather, an adverse employment action simply requires "a 'materially adverse change in the terms and conditions of employment.'" Faggiano v. Eastman Kodak Co., 378 F. Supp. 2d 292, 299 (W.D.N.Y. 2005) (citations omitted). The issue of whether Mr. Shuman had a legal entitlement to the commissions has absolutely no effect on his claim for unlawful retaliation.[7] In fact, courts regularly find the existence of an adverse employment action where an employer denies an employee discretionary benefits and privileges, including bonuses, compensation increases and other benefits. See, e.g., Mandel v. Champion Int'l Corp., 361 F. Supp. 2d 320,

---

[7]     In any event, the question of whether Mr. Shuman was entitled to the commissions is a question of fact for the jury in connection with his claims for breach of contract.

326 (S.D.N.Y. 2005) (denial of discretionary pay increase constitutes adverse employment action); Faggiano v. Eastman Kodak Co., 378 F. Supp. 2d at 306 (loss of opportunity to earn overtime benefits sufficient to demonstrate adverse employment action); Robinson v. Time Warner Inc., 92 F. Supp. 2d 318, 332 (S.D.N.Y. 2000) (award of low discretionary bonus and salary increase constituted adverse employment action). Here, the fact that Defendants admittedly withheld from Mr. Shuman commissions on the investment by Howard Hughes in April 2004 is more than sufficient to demonstrate an adverse employment action, despite the fact that Defendants allegedly believe that Mr. Shuman is not entitled to such commissions.

Defendants also improperly rely on the purported absence of any enforceable right to the Howard Hughes commissions as the basis to claim that there can be no causal connection, as a matter of law, between the filing of the Complaint on April 29, 2004 and the failure to pay the commissions two months later. However, it is well-settled that the causal connection needed for proof of a claim for unlawful retaliation can be established indirectly by showing that the plaintiff's protected activity was closely followed in time by the alleged adverse employment action. See, e.g., Heredia v. Small, 98 Civ. 5351, 2006 WL 47667, at *5 (S.D.N.Y. Jan. 9, 2006); see also Faggiano v. Eastman Kodak Co., 378 F. Supp. 2d at 306 (holding two-month gap permits inference of causal connection).

There is no dispute that on or about April 1, 2004, Howard Hughes Medical Institute, an existing prestigious institutional investor brought to Defendants by Mr. Shuman during his employment, invested $20 million into one of Defendants' hedge funds. (see Pl. 56.1 Stmt. ¶ 32) In addition, there is no dispute that Mr. Shuman initiated this action on April 29, 2004. Approximately two months after Mr. Shuman initiated this action, Defendants failed to pay him the proper commissions on the Howard Hughes investment. This close temporal

proximity between Mr. Shuman's filing the Complaint in this action and Defendants' failure to pay him the commissions that he earned on the Howard Hughes investment is sufficient to create an inference of causal connection.  Accordingly, Defendants' motion for summary judgment with respect to Mr. Shuman's claims of unlawful retaliation should be rejected.

## CONCLUSION

For all the foregoing reasons, the Court should deny Defendants' motion for partial

summary judgment in its entirety.

Dated: New York, New York
      February 24, 2006

                             **THOMPSON WIGDOR & GILLY LLP**

                             Kenneth P. Thompson (KT-6026)
                             Douglas H. Wigdor (DH-9737)
                             Andrew S. Goodstadt (AG-2760)

                             Empire State Building
                             350 Fifth Avenue, Suite 5720
                             New York, New York 10118-0110
                             Tel:   (212) 239-9292
                             Fax:  (212) 239-9001

## CERTIFICATE OF SERVICE

Copies of the foregoing Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment, Plaintiff's Rule 56.1 Statement and Affirmation of Douglas H. Wigdor were served this 24th day of February, 2006, by email on counsel for Defendants as follows:

> Anne C. Patin, Esq.
> Seward & Kissel LLP
> One Battery Park Plaza
> New York, New York  10004

_____
Douglas H. Wigdor